In the

# United States Court of Appeals

### For the Seventh Circuit

Nos. 10-2835 & 10-3264

KENDALL TUCKER,

*Plaintiff-Appellant,*
*Cross-Appellee,*

*v.*

KARL WILLIAMS,

*Defendant-Appellee,*
*Cross-Appellant,*

and

FULTON COUNTY, ILLINOIS, et al.,

*Defendants-Appellees.*

Appeals from the United States District Court
for the Central District of Illinois.
No. 1:08-cv-01164-MMM-JAG—**Michael M. Mihm**, *Judge.*

ARGUED OCTOBER 21, 2011—DECIDED JUNE 5, 2012

Before BAUER and TINDER, *Circuit Judges*, and MAGNUS-STINSON, *District Judge.*[*]

---

[*] The Honorable Jane E. Magnus-Stinson, District Judge of the United States District Court for the Southern District of Indiana, sitting by designation.

BAUER, *Circuit Judge.* After investigating a report that Kendall Tucker was in possession of a stolen backhoe, Karl Williams, a state law enforcement investigator, seized the backhoe without a warrant. Tucker brought a civil rights action in district court, claiming that his rights under the Fourth Amendment and Due Process Clause were violated. The district court disagreed and dismissed Tucker's claims on summary judgment. We affirm.

## I. BACKGROUND

Defendant Karl Williams is a Fulton County Sheriff's Deputy assigned to the West Illinois Task Force ("Task Force"). The Task Force is an Illinois Intergovernmental Agency, created by an Interagency Agreement between the Illinois State Police and a number of local law enforcement agencies. During a routine narcotics investigation, an informant told the Task Force that plaintiff Kendall Tucker was in possession of a stolen backhoe. Based on the statements made by the informant—who is Tucker's estranged brother-in-law—Williams went to Tucker's house on June 22, 2007 to investigate the matter.

At Tucker's house, Williams observed a backhoe in the driveway and asked Tucker about it, explaining that Tucker's brother-in-law had said it was stolen. Tucker said that in the summer of 2000 or 2001, his friend, Randal Re, told him about a backhoe for sale that they could buy for cheap—$20,000—because the seller was in the middle of a divorce. Tucker, believing that this was a "real good price," borrowed $10,000 from

Patrick O'Flaherty, and gave it to Re, who added his half and paid the seller; Tucker did not know the name of the seller. Nor did he receive a bill of sale or any other ownership documents.

After telling all this to Williams, Tucker then said, "If it's stolen, go ahead and take it then." Williams took the serial number of the backhoe and went to his car to see if the backhoe had been reported stolen. Williams then told Tucker that it was not reported stolen, but asked Tucker not to move the backhoe while the investigation continued.

Williams' next contact with Tucker was August 10, 2007; Williams went to Tucker's house, but neither Tucker nor the backhoe was present. Tucker would later explain that he had lent the backhoe to Mike Krulac to repair a water line.

When Williams finally reached Tucker, he requested that he come to the Canton Police Department to be interviewed. At this meeting, Tucker asked if the backhoe was stolen. Williams responded that he was still investigating that question and Tucker again said, "Why don't you just come and get it?" Tucker does not recall whether he told Williams he could take the backhoe.

Williams continued his investigation and eventually determined—by tracking the serial number—that at one point the backhoe had been sold to Illinois Contracting and Materials Company ("ICMC"), a construction company in Chicago. Williams contacted ICMC and learned that the backhoe had been missing from its inventory for about five years. ICMC's records did *not* show a sale of

the backhoe, and ICMC faxed the extended warranty that it had obtained when it first acquired the backhoe.

After speaking with the Fulton County State's Attorney, but acting without a warrant, Williams seized the backhoe from Krulac's farm on August 29, 2007. Krulac telephoned Tucker, notifying him that Williams had seized the backhoe. Tucker never contacted the Task Force to object to the seizure or demand the backhoe be returned; nor did he contact the Fulton County State's Attorney, request a hearing, or initiate a state court proceeding to have the backhoe returned. On November 7, 2007, ICMC picked up the backhoe.

Tucker filed a complaint asserting violations of state and federal law. Specifically, Tucker brought claims under 42 U.S.C. § 1983 against Williams alleging that his Fourth Amendment and due process rights had been violated. Tucker also brought state-law claims, but those claims were abandoned either at the district court or on appeal. Pursuant to the Illinois Local Governmental Tort Immunity Act, Tucker joined Fulton County, Illinois and the Task Force because of indemnification obligations. Finally, Tucker brought claims against Jeff Standard, Sheriff of Fulton County, under the theory of common-law-respondeat superior.

The district court granted summary judgment against Tucker on the federal claims, concluding that the initial seizure of the backhoe satisfied the Fourth Amendment and due process requirements. The district court also found that the Task Force was a state entity entitled to Eleventh Amendment immunity; the district court,

however, denied summary judgment on Tucker's due process claim concerning the disposition of the backhoe after the initial seizure. Williams sought leave to file a supplemental motion for summary judgment on that issue. Leave was granted and ultimately the district court determined that Williams was entitled to summary judgment on the post-seizure disposition due process claim. At the same time, the district court—*sua sponte* and under its inherent authority—determined that Williams should pay Tucker attorney's fees in responding to both motions. Tucker appeals the rulings on the merits of his constitutional claims and Williams cross-appeals the district court's award of attorney's fees.

## II. DISCUSSION

The Task Force was granted summary judgement on the grounds that it is a state entity entitled to Eleventh Amendment immunity. We agree. The Eleventh Amendment provides states with immunity from suits in federal courts unless the State consents to the suit or Congress has abrogated their immunity. *Seminole Tribe v. Florida*, 517 U.S. 44, 54 (1996). State agencies are treated the same as states for purposes of the Eleventh Amendment. *Davidson v. Bd. of Govs.*, 920 F.2d 441, 442 (7th Cir. 1990).

On appeal, Tucker argues that the district court erred in concluding that the Task Force was a state entity. Tucker asserts that under the Illinois Local Government Tort Immunity Act, Eleventh Amendment immunity does not attach to "local public entities" and an intergov-

ernmental agency—like the Task Force—is included in the definition of "local public entities." 745 ILCS 10/1-206. But that argument leads to an inconsistent result. The Interagency Agreement provides that the State will provide representation and indemnification pursuant to the State Employee Indemnification Act, codified at 5 ILCS 350/1. That Act, however, specifically excludes "local public entities" from its definition of the State.[1] Were we to accept Tucker's argument that the Task Force is a local public entity, the Interagency Agreement would provide for representation and indemnification of Task Force personnel but, at the same time, refer to a statute that would prevent coverage.

Tucker's argument assumes that, if an entity is an intergovernmental agency, it cannot *also* be a state agency. That is not the case. The definition of "local public entities" does include intergovernmental agencies; but, at the same time, it specifically excludes an "agency of the state." *See* 745 ILCS 10/1-206. So if the Task Force is a state agency, the mere fact that it is also an intergovernmental agency does not mean that it is a "local public entity" for purposes of the Illinois Tort Immunity Act.

To determine if a particular entity is a state agency, i.e., an arm of the state, courts look at: (1) the extent of the

---

[1] "The term State . . . does not mean any local public entity as that term is defined in Section 1-206 of the Local Governmental and Governmental Employees Tort Immunity Act." 5 ILCS 350/1.

entity's financial autonomy from the state; and (2) the "general legal status" of the entity. *Kashani v. Purdue Univ.*, 813 F.2d 843, 845-47 (7th Cir. 1987). Of the two, the entity's financial autonomy is the "most important factor." *Peirick v. Indiana Univ.-Purdue Univ. Indianapolis Athletics Dep't*, 510 F.3d 681, 695 (7th Cir. 2007). In evaluating that factor, we consider the extent of state funding, the state's oversight and control of the entity's fiscal affairs, the entity's ability to raise funds independently, whether the state taxes the entity, and whether a judgment against the entity would result in the state increasing its appropriations to the entity. *Kashani*, 813 F.2d at 845; *see also Hess v. Port Auth. Trans-Hudson Corp.*, 513 U.S. 30, 48 (1994) (recognizing "the vulnerability of the State's purse as the most salient factor in Eleventh Amendment determinations").

Taking into account these factors in light of the Interagency Agreement, we conclude that the Task Force is a state agency. According to the Interagency Agreement, the Illinois State Police approves the use of all official funds and supervises all Task Force operations. The Interagency Agreement also provides that the Director of the Illinois State Police appoints personnel to the Task Force, and such personnel are considered employees of the State, and are indemnified and represented by the State as state employees. The Interagency Agreement further provides that the Illinois State Police supply all facilities, training, and specialized equipment. Under these facts, the Task Force is an extension of the Illinois State Police and, as such, is entitled to the same immunity protections afforded to the State Police. Summary judgement for the Task Force was proper.

### A.  Tucker's Fourth Amendment Claim

Because Williams was sued in his individual capacity, we address the merits of Tucker's § 1983 claims. The district court found that Williams was entitled to summary judgment on Tucker's Fourth Amendment claim because Tucker consented to Williams' seizure of the backhoe.[2] A consensual seizure of property without a warrant does not violate the Fourth Amendment. *United States v. Matlock*, 415 U.S. 164, 171 (1974); *United States v. Groves*, 470 F.3d 311, 318 (7th Cir. 2006).

Recall that Tucker commented to Williams about the backhoe, "If it's stolen, go ahead and take it then." That remark was made on June 22, 2007. But Williams seized the backhoe two months later on August 29, 2007, and therefore, Tucker argues—for the first time on appeal—that there is a triable issue of fact as to whether his consent on June 22, 2007 was still effective when Williams seized the backhoe on August 29, 2007; of course Tucker insists that it was *not*, thus rendering the seizure unreasonable.

In the district court, however, Tucker argued that there is an issue of fact as to whether his comment on June 22, 2007 constituted a valid consent at all. There, he argued that his comment—"If it's stolen, go ahead and take it then"—was not unequivocal and meant that Williams had permission to seize the backhoe only if it

---

[2] The district court also determined that Williams had probable cause to seize the backhoe and was entitled to qualified immunity.

were *actually* stolen. Tucker abandons that argument and, in any event, Tucker's new argument swallows his argument in the district court; a consent must first be valid before it can be limited in scope. Both arguments are weak, but we will address the stronger of the two: whether Tucker's consent was still effective when Williams seized the backhoe.

Generally speaking, a person who has given valid consent to a seizure may limit or withdraw that consent. *Florida v. Jimeno*, 500 U.S. 248, 252 (1991) ("A suspect may of course delimit as he chooses the scope of the search to which he consents."); *United States v. Jachimko*, 19 F.3d 296, 299 (7th Cir. 1994) (stating the general principle that consent may be withdrawn). But, where a person does not withdraw his valid consent to a seizure, the consent remains valid. *See United States v. Jackson*, 598 F.3d 340, 347 (7th Cir. 2010). Knowing this, Tucker argues that he impliedly limited the scope of his consent to the day he gave it. The standard for measuring the scope of consent under the Fourth Amendment is one of objective reasonableness and asks what a reasonable person would have understood by the exchange between the law enforcement agent and a person who gives consent. *Id*. at 348.

Tucker offers no evidence to suggest that a reasonable person in Williams' position would have understood Tucker's consent on June 22, 2007 to be impliedly limited to that day only. In fact, the evidence demonstrates that, if anything, a reasonable person would have understood Tucker's consent to be indefinite. During Williams'

and Tucker's exchange on June 22, 2007, Tucker understood that Williams was unable to determine, then and there, whether the backhoe was stolen; indeed, Tucker agreed not to move the backhoe because he understood that the investigation was not complete. Nevertheless, Tucker insists that there is a triable issue of fact on whether he limited the scope of consent and asserts that a reasonable jury could find that his statement "If it's stolen, go ahead and take it then," did not extend beyond the day on which he gave it. But there is no evidence in the record indicating that he limited the scope of his consent in any way, much less to a single day. His consent, therefore, was still valid and effective when Williams seized the backhoe on August 29, 2007, and the district court properly granted Williams summary judgment on Tucker's Fourth Amendment claim. Because we do not find a constitutional violation, we need not and do not address Williams' qualified immunity defense. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009); *Hanes v. Zurick*, 578 F.3d 491, 493 (7th Cir. 2009).

### B.  Tucker's Due Process Claim

Tucker asserts that Williams deprived him of property—his backhoe—without due process of law in violation of the Fourteenth Amendment.

Assuming that Tucker's interest in the backhoe was a protected interest under the Fourteenth Amendment, the dispute in this case concerns what process Tucker was due. Generally, due process requires some kind of hearing *before* the State deprives a person of liberty or

property. *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985). In some circumstances, however, a postdeprivation hearing or a common-law-tort remedy satisfies due process. *See Zinermon v. Burch*, 494 U.S. 113, 127(1990) (listing examples). And here, the district court determined that Illinois tort remedies were all the due process that Tucker was due. Tucker, of course, challenges that determination.

Tucker correctly recognizes that, if Williams' initial seizure of the backhoe satisfies the Fourth Amendment—and we hold that it does—then he was not entitled to a predeprivation hearing. *See United States v. James Daniel Good Real Prop*., 510 U.S. 43, 67 (1993); *Fuentes v. Shevin*, 407 U.S. 67, 93 n. 30 (1972); *PPS, Inc. v. Faulkner Cnty*., 630 F.3d 1098, 1107 (8th Cir. 2011); *Becker v. Kroll*, 494 F.3d 904, 920 (10th Cir. 2007); *Sanders v. City of San Diego*, 93 F.3d 1423, 1429 (9th Cir. 1996). Knowing this, Tucker centers his due process claim around Williams' post-seizure disposition of the backhoe—arguing that he was entitled to a notice and hearing after the seizure of the backhoe and prior to its delivery to ICMC. To support that argument, Tucker treats Williams' delivery of the backhoe to ICMC as a separate and distinct property deprivation requiring the same sort of process due in situations concerning an initial deprivation. That is incorrect. There is only one property deprivation here: Williams' initial seizure of the backhoe. Due process did not require that Tucker be given a predeprivation hearing; Tucker's consent validated the seizure under the Fourth Amendment. When a predeprivation hearing is not required, due

process only requires that the government provide mean-ingful procedures to remedy erroneous deprivations. *See Parratt v. Taylor*, 451 U.S. 527, 541 (1981) ("[C]ases which have excused the prior-hearing requirement have rested in part on the availability of some meaningful opportunity subsequent to the initial taking for a determination of rights and liabilities."); *see also Holstein v. City of Chicago*, 29 F.3d 1145, 1149 (7th Cir. 1994) (finding that where no predeprivation was required, adequate state post-deprivation procedures comported with due process).

Here, adequate postdeprivation procedures were avail-able to Tucker; he could have brought a claim for con-version or replevin. *See Stewart v. McGinnis*, 5 F.3d 1031, 1036 (7th Cir. 1993) (finding Illinois tort laws were ade-quate postdeprivation procedures); *Greco v. Guss*, 775 F.2d 161, 169 (7th Cir. 1985) (holding that a state-law claim for conversion was an adequate postdepivation remedy). What Tucker was entitled to, and got, was the right to seek relief against that seizure, and he had that by virtue of Illinois tort laws. We do not find a due process violation.

## C. Sanctions

The district court entered sanctions against Williams, awarding Tucker attorney's fees in the amount of $3,000 for the time Tucker's attorney spent responding to Williams' motion for leave to file a supplemental motion for summary judgment and the actual supple-mental motion for summary judgment. In support of its

sanction, the district court stated that Williams' briefing on the post-seizure due process issue was "inadequate"; that litigation should not be "conducted piecemeal"; and that if the court did not grant Williams' supplemental motion for summary judgment, the result "would have been to put [him] to the expense of a trial." The district court then determined that, in "fairness to" Tucker, sanctions were proper in the exercise of the court's "inherent authority."

We review a district court's imposition of sanctions under its inherent authority for an abuse of discretion. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 55 (1991); *Cleveland Hair Clinic, Inc., v. Puig*, 200 F.3d 1063, 1066 (7th Cir. 2000). Sanctions imposed pursuant to the district court's inherent power are appropriate where a party has willfully abused the judicial process or otherwise conducted litigation in bad faith. *Salmeron v. Enter. Recovery Sys., Inc.*, 579 F.3d 787, 793 (7th Cir. 2009); *Maynard v. Nygren*, 332 F.3d 462, 470-71 (7th Cir. 2003); *see also Runfola & Assoc., Inc. v. Spectrum Reporting II, Inc.*, 88 F.3d 368, 375 (6th Cir. 1996); *Gillette Foods Inc. v. Bayernwald-Fruchteverwertung, GmbH*, 977 F.2d 809, 813-14 (3d Cir. 1992) (prerequisite to a sanction under the inherent power is a finding of bad faith).

Without a finding that Williams acted in bad faith or engaged in misconduct, the district court sanctioned him, seemingly, in the interest of "fairness." This is precisely the sort of sanction that is outside the court's inherent power and that we have cautioned against in the past. We have stated that a district court must

exercise restraint and caution in exercising its inherent power. *Schmude v. Sheahan*, 420 F.3d 645, 650 (7th Cir. 2005). And it is "not a grant of authority to do good, rectify shortcomings of the common law. . . or undermine the American rule on the award of attorneys' fees to the prevailing party in the absence of statute." *Zapata Hermanos Sucesores, S.A. v. Hearthside Baking Co., Inc.*, 313 F.3d 385, 391 (7th Cir. 2002) (citations omitted).

Here, the district court did not articulate a valid basis on which to award attorney's fees as a sanction; indeed, there is no evidence in the record to suggest that Williams' failure to notify Tucker of his intention to file a supplemental motion for summary judgment was in bad faith, designed to obstruct the judicial process, or a violation of a court order. At worst, the evidence suggests that even if Williams' conduct amounted to clumsy lawyering, it was not sufficient to warrant sanctions under the court's inherent authority.

The district court's and Tucker's frustration may be understandable but by upholding this sanction—without a finding of bad faith—we would be imposing a level of foresight and efficiency that is simply unattainable in litigation. Efficiency, unfortunately, has never been an earmark of litigation. Lawyering must be in good faith; it need not be omniscient. The district court's award of attorney's fees was an abuse of its discretion, and we reverse that ruling.

## III. CONCLUSION

For the reasons we stated above, we AFFIRM the district court's entry of summary judgment and REVERSE its award of attorney's fees.