In the

# United States Court of Appeals
## For the Seventh Circuit

Nos. 13-3906 & 14-1097

NCLOSURES INC.,

*Plaintiff-Appellant/Cross-Appellee,*

*v.*

BLOCK AND COMPANY, INC.,

*Defendant-Appellee/Cross-Appellant.*

Appeals from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:12-cv-09358 — **Samuel Der-Yeghiayan**, *Judge.*

ARGUED SEPTEMBER 15, 2014 — DECIDED OCTOBER 22, 2014

Before FLAUM, KANNE, and SYKES, *Circuit Judges.*

FLAUM, *Circuit Judge.* In May 2011, nClosures Inc. and
Block and Company, Inc. began a business relationship in
which nClosures designed and Block manufactured metal
enclosures for electronic tablets, such as iPads. At the outset
of the relationship, the parties signed a confidentiality
agreement; nClosures then divulged its designs for the en-
closure device to Block for manufacture. The first device—

known as the Rhino Elite—entered the market for sale in October 2011. By March 2012, however, Block developed its own competing device, known as the Atrio.

In November 2012, nClosures brought suit in diversity against Block alleging, among other claims, breach of contract and breach of fiduciary duty. The district court granted summary judgment to Block on both claims. On the breach of contract claim, the district court concluded that no reasonable jury could find that nClosures took reasonable steps to keep its proprietary information confidential, and therefore that the confidentiality agreement was unenforceable. The district court also concluded that no reasonable jury could find that a partnership existed between nClosures and Block that could give rise to a viable breach of fiduciary duty claim. However, the district court denied Block's motion for attorney's fees.

nClosures challenges the district court's rulings on summary judgment, and Block—as cross-appellant—challenges its denial of Block's motion for attorney's fees. We affirm in both respects.

## I. Background

nClosures is an industrial design firm co-founded in 2011 by Daniel Gorman, Daniel McKean, and Kemper Barkhurst. After its formation, nClosures developed metal cases for electronic tablets, such as iPads. Designer and independent contractor Ian LeBlanc designed one such device—the Rhino Elite—for nClosures in early 2011. Later that year on May 24th, nClosures co-founders McKean and Gorman attended a trade show in Chicago to display prototypes of the Rhino (a precursor to the Rhino Elite). There, Block CEO Greg Carl-

son approached them about a potential business relationship. Block previously manufactured and sold metal devices like cash drawers, but had recently identified tablet enclosures as a potential new product line.

At the May 24th meeting between nClosures and Block, the companies signed a confidentiality agreement wherein they agreed to the following:

> The Parties … agree that the Confidential Information received from the other Party shall be used solely for the purposes of engaging in the Discussions and evaluating the Objective (the "Permitted Purposes"). Except for such Permitted Purposes, such information shall not be used, either directly or indirectly, by the Receiving Party for any other purpose … .

The agreement defines "the Objective" as "a potential business relationship with respect to iPad Enclosures." Outside of this initial agreement, nClosures did not require other Block employees or engineers to sign additional agreements in order to access Rhino or Rhino Elite design files. nClosures also did not enter into confidentiality agreements with Rhino Elite designer Ian LeBlanc, or with the manufacturers that produced Rhino Elite predecessors known as the Lab Shield and the Rhino. However, a declaration by nClosures co-founder Daniel McKean states, "It is nClosures's policy to not share its designs, know-how, or market knowledge with other parties unless pursuant to a non-disclosure agreement. nClosures has a policy of granting employees access to this information only on a need-to-know basis."

After signing the confidentiality agreement, nClosures provided Block with the design files for the Rhino products. Subsequently, nClosures and Block attempted to negotiate a written agreement concerning the manufacture and sale of the tablet enclosures. Although the companies never agreed on a written contract, they exchanged at least three draft agreements during negotiations. After these failed attempts, the parties reached an oral agreement on the following terms: Block agreed to manufacture the Rhino Elite and sell the units to nClosures at $19.25 per unit. nClosures was permitted to sell some units to its customers, and some units back to Block at an increased price of $53 per unit. nClosures therefore netted $33.75 on the units it sold back to Block.

In a June 2012 e-mail, Block Vice President and General Manager David Kauffman referred to this arrangement with nClosures as a "license fee." On the other hand, another Block employee—Scott Nease—described these proceeds as the "net profit" for nClosures in an August 2012 e-mail. In this same e-mail, Nease also indicated that the buyback arrangement was really just a formality by stating "[i]t would be much cleaner … to simply issue a purchase order and pay NClosure [sic] for $33.75 @ and not go through the formality of sales and buyback, when a sale never really occurred in the first place."

By mid-October 2011, the first Rhino Elite device manufactured by Block entered the market. Shortly thereafter, the parties became aware of various design problems with the device, and Block's engineers helped to re-design the Rhino Elite bracket to better hold tablets in place inside the enclosure. Either subsequently or simultaneously, Block also developed a design for its own tablet enclosure, known as the

Atrio.[1] In August 2012, Block terminated its business rela-
tionship with nClosures, and nClosures subsequently filed
this suit against Block alleging fraud, trade secret misappro-
priation, breach of fiduciary duty, and breach of contract. In
December 2012, nClosures sought a preliminary injunction
on its breach of contract claim, which the district court
granted.

On September 6, 2013, the parties filed cross-motions for
summary judgment—nClosures sought partial summary
judgment on its claims for fraud and breach of contract, and
Block sought summary judgment on all four of nClosures's
claims. On December 11, the district court granted summary
judgment for Block.[2] Block then filed a sealed motion for at-
torney's fees under the Illinois Trade Secrets Act, as well as
28 U.S.C. § 1927 and the district court's inherent authority.
The district court orally denied this motion.

## II. Discussion

We review a district court's grant of summary judgment
de novo, taking all facts and their reasonable inferences in
the light most favorable to the nonmovant. *Hansen v. Fincant-
ieri Marine Grp., LLC*, 763 F.3d 832, 836 (7th Cir. 2014).

---

[1] nClosures claims that the Atrio is nearly identical to the Rhino Elite,
while Block notes several distinctions. For instance, the Atrio is a one
piece design using a "piano-type hinge" to join the top and bottom of the
enclosure, while the Rhino Elite is a two-piece design where the cover
and the bottom of the enclosure are separate pieces that lock together.

[2] Although the district court granted Block's motion for summary judg-
ment on all four of nClosures's claims, nClosures only challenges the
district court's decision regarding the breach of contract and breach of
fiduciary duty claims.

**A. Breach of Contract.**

To bring a successful breach of contract claim under Illinois law, a party must show "(1) the existence of a valid and enforceable contract; (2) substantial performance by the plaintiff; (3) a breach by the defendant; and (4) resultant damages." *TAS Distrib. Co. v. Cummins Engine Co.*, 491 F.3d 625, 631 (7th Cir. 2007) (citation omitted). Additional considerations arise, however, when we assess the enforceability of a confidentiality agreement. *See Tax Track Sys. Corp. v. New Investor World, Inc.*, 478 F.3d 783, 787 (7th Cir. 2007). In *Tax Track*, we held that a federal court applying Illinois law "will enforce [confidentiality] agreements only when the information sought to be protected is actually confidential and reasonable efforts were made to keep it confidential." *Id.* (citing *Curtis 1000, Inc. v. Suess*, 24 F.3d 941, 947 (7th Cir. 1994)). Thus, in order to enforce the confidentiality agreement between nClosures and Block, we must find that nClosures took reasonable steps to keep its proprietary information confidential.[3]

In *Tax Track*, we upheld a district court's grant of summary judgment which found a confidentiality agreement unenforceable, holding that no reasonable jury could conclude that Tax Track engaged in reasonable efforts to protect

---

[3] nClosures argues that *ILG Industries, Inc. v. Scott*, 273 N.E.2d 393 (Ill. 1971), governs because in that case, the Illinois Supreme Court did not require a written confidentiality agreement in order to protect proprietary information. However, *ILG* is not on point. The *ILG* court protected plaintiff's proprietary information on the ground that it constituted a trade secret; there was no alleged breach of contract. *See id.* at 394. Hence, *ILG* is inapplicable here.

its confidential information. *Id.* at 788. We emphasized that no reasonable steps were taken where the proprietary information in question was a company memo distributed to 600–700 people, was not stamped with the word "Confidential," and where only some of the recipients signed confidentiality agreements. *Id.*

In contrast, in *Rockwell Graphic Systems Inc. v. DEV Industries, Inc.*, 925 F.2d 174, 180 (7th Cir. 1991), we found that the steps taken to protect the proprietary information at issue were substantial enough to preclude summary judgment for the defendants in a trade secrets misappropriation case. In *Rockwell*, unlike in *Tax Track*, the engineering drawings at issue were kept in a vault with limited access. *Id.* at 177. The engineers who used the drawings were required to sign agreements not to disseminate the drawings or disclose their contents. *Id*. Furthermore, vendors permitted to access copies of the drawings also signed confidentiality agreements, and each drawing was marked with an indication that it contained proprietary information. *Id*. While this Court did not determine whether the steps in *Rockwell* were sufficient to protect the trade secrets at issue, we did find that these steps were substantial enough to preclude summary judgment in favor of the defendants.

The steps taken in *Rockwell*, however, far exceed the measures employed by nClosures, and more closely resemble the steps taken in *Tax Track*. While nClosures and Block did sign a confidentiality agreement at the outset of their business relationship, no additional confidentiality agreements were required of individuals who accessed the design files for the Rhino or Rhino Elite devices. Additionally, neither the Rhino nor the Rhino Elite drawings were marked

with words such as "confidential" or "contains proprietary information." Furthermore, the drawings were not kept under lock and key, nor were they stored on a computer with limited access. While the declaration of Daniel McKean states generally that nClosures had a policy of requiring confidentiality agreements, no such agreements were required of designer Ian LeBlanc or of the manufacturers that produced previous versions of the Rhino Elite. These facts show that nClosures did not engage in reasonable steps to protect the confidentiality of its proprietary information, and therefore that the confidentiality agreement with Block is unenforceable. We affirm the district court's ruling that no reasonable jury could find otherwise.

## B. Breach of Fiduciary Duty.

The district court held that Block and nClosures did not share profits and did not form a partnership, and therefore that nClosures's breach of fiduciary duty claim lacked merit. We agree.

To establish a breach of fiduciary duty under Illinois law, a plaintiff must show that "(1) a fiduciary duty exists; (2) the fiduciary duty was breached; and (3) the breach proximately caused the injury of which the plaintiff complains." *Ball v. Kotter*, 723 F.3d 813, 826 (7th Cir. 2013) (citing *Neade v. Portes*, 739 N.E.2d 496, 502 (Ill. 2000)). A fiduciary duty may be established through relationships such as partnerships and joint ventures, as well as special circumstances. *Autotech Tech. Ltd. P'ship v. Automationdirect.com*, 471 F.3d 745, 748–49 (7th Cir. 2006). The Illinois Uniform Partnership Act defines a partnership as "the association of 2 or more persons to carry on as co-owners of a business for profit." 805 Ill. Comp. Stat. 206/202(a). Considerations including the intent of the

parties, as well as whether the entities shared profits, are relevant in analyzing whether a partnership existed.

Sharing of profits is instructive but not always conclusive evidence of a partnership. Illinois law states that "[a] person who receives a share of the profits of a business is presumed to be a partner," 805 Ill. Comp. Stat. 206/202 (c)(3), unless the individual received the profits as compensation as an independent contractor or an employee. *Id.* at (c)(3)(ii). Evidence of profit-sharing, however, does not guarantee a partnership. In *Argianas v. Chestler*, the Illinois Appellate Court held that no partnership existed—even though the plaintiff received 40% of the profits from a particular account—where the relevant agreement provided the plaintiff with a salary and did not indicate that a partnership existed. 631 N.E.2d 1359, 1368–70 (Ill. App. Ct. 1994). The *Argianas* court explained that "[a]lthough a sharing of profits is an essential test in determining the existence of a partnership, mere participation in profits, does not alone create a partnership." *Id.* at 1368.

Our decision in *Autotech* is also instructive. In *Autotech*, we affirmed a district court's determination that no fiduciary duty was owed—and therefore that no breach of this duty occurred—when a manufacturer and a marketer failed to form a partnership under Illinois law. 471 F.3d at 749. Similar to the arrangement between nClosures and Block, the parties in *Autotech*—ADC and Autotech—engaged in a business relationship whereby one company manufactured a product and the second company marketed it. *Id.* at 747. The agreement between the parties specified that neither party had the right or responsibility "to assume or to create any obligations or responsibilities expressed or implied on behalf

of or in the name of the other or to bind the other party in any manner whatsoever." *Id*. ADC then developed a similar and competing product, and Autotech sued for breach of fiduciary duty, among other claims, and subsequently filed a motion for a preliminary injunction. *Id*. at 747–48. We held that the district court did not abuse its discretion in denying the injunction and concluded that no partnership, joint venture, or special relationship existed. We emphasized that "the contract expressly prohibited joint control; there was no provision for profit sharing and loss; the parties did not file joint tax returns; and there was no evidence of intent to be associated as a partnership or joint venture." *Id*. at 749.

nClosures argues that its recovery of $33.75 per Rhino Elite unit demonstrates a profit-sharing arrangement, and therefore the existence of an nClosures-Block partnership. Block, on the other hand, argues that this arrangement was a license fee or simply nClosures's individual profit, but that the two companies did not share profits.[4] Based on the considerations outlined in *Argianas* and *Autotech*, we conclude that no reasonable jury could find that nClosures and Block formed a partnership, and therefore that no breach of fiduciary duty occurred. nClosures does not adequately support its argument that the net gain of $33.75 per Rhino Elite unit constituted a profit-sharing arrangement with Block, especially because there was no agreement between the parties to characterize the net gain in this manner. But even if we were

---

[4] As previously noted, Block referred to the $33.75 as a licensing fee in one instance, and as "net profit" to nClosures in another instance. The record does not contain a statement regarding nClosures's characterization of the $33.75 per unit gain at the time it entered into the oral agreement with Block.

to accept that profit-sharing occurred, *Argianas* demonstrates that profit sharing alone is sometimes insufficient to establish a partnership under Illinois law. Considering the factors outlined in *Autotech*, there is no evidence that the parties engaged in other activities suggestive of a partnership: the parties did not sign a partnership agreement, did not file joint tax returns, and did not hold themselves out to be partners in any way. Thus, regardless of nClosures's modest assertion that its arrangement with Block constituted profit-sharing, other elements of the nClosures-Block relationship do not indicate a partnership.

Additionally, the record suggests that the parties never intended to carry on as co-owners of a business for profit, and therefore failed to form a partnership under Illinois law. *See* 805 Ill. Comp. Stat. 206/202(a). In granting summary judgment to Block, the district court emphasized that all three of the draft agreements between Block and nClosures contained a clause stating that nothing in the conduct of either party "shall be deemed to constitute either party an agent, partner, joint venture or employee of the other." *nClosures Inc. v. Block & Co., Inc.*, No. 12 C 9358, 2013 WL 6498528, at * 4 (N.D. Ill. Dec. 11, 2013).[5] While this unexecuted agreement does not legally bind nClosures, it is probative

---

[5] nClosures argues that the district court incorrectly considered this language, citing *Matter of Holder's Estate*, 355 N.E.2d 333, 334–35 (Ill. App. Ct. 1976) for the proposition that a court may not rely on unexecuted agreements as proof of a subsequent agreement or its terms. However, *Holder* more correctly stands for the proposition that an oral agreement to convey property cannot be enforced through specific performance when the agreement was merely an agreement to reduce the terms of the conveyance to writing. *Holder*, therefore, is simply too distinct from this case to be dispositive.

of the parties' intent underlying their business relationship. Illinois courts have held that when no written agreement exists, it is appropriate to consider the intent of the parties and the facts and circumstances surrounding the alleged partnership formation. *See e.g., Snyder v. Dunn*, 638 N.E.2d 744, 747 (Ill. App. Ct. 1994). Therefore, we consider the language of the unexecuted agreements between Block and nClosures for this purpose. Because all three of the agreement drafts contained a clause specifying that the parties should not be construed as partners, and because there is no evidence that nClosures objected to the inclusion of this clause, we are persuaded that nClosures and Block did not contemplate a partnership when structuring their business relationship.

For these reasons, there is a lack of evidence from which a reasonable jury could conclude that nClosures and Block formed a partnership under Illinois law, and thus nClosures's breach of fiduciary duty claim must fail.

### C. Attorney's Fees.

On December 26, 2013, Block filed a sealed motion seeking attorney's fees under three theories: (1) the Illinois Trade Secrets Act ("the ITSA"), (2) 28 U.S.C. § 1927, and (3) the district court's "inherent authority." Under the ITSA, a defendant in a trade secret action can recover its reasonable attorney's fees if "a claim of misappropriation is made in bad faith." 765 Ill. Comp. Stat. 1065/5(i). Additionally, under 28 U.S.C. § 1927, an attorney may be required to pay costs and expenses when he or she "multiplies the proceedings … unreasonably and vexatiously." Furthermore, sanctions pursuant to a district court's inherent authority "are appropriate where a party has willfully abused the judicial

process or otherwise conducted litigation in bad faith." *Tucker v. Williams*, 682 F.3d 654, 661–62 (7th Cir. 2012).

In denying Block's motion for attorney's fees, the district court stated:

> I know the case. I did not find anything that comes remotely close that there was no basis for the lawsuit or that it was in bad faith. I agree with counsel for plaintiffs. I entered summary judgment in this case. I understand it's on appeal. And I might be right, I might be wrong on that summary judgment, but I'm not going encourage any further litigation on that issue. There's been no bad faith on the part of the plaintiffs.

Block insists that the district court's dismissal of its motion for attorney's fees was improper, citing *IDS Life Insurance Co. v. Royal Alliance Associates, Inc.*, 266 F.3d 645, 653–54 (7th Cir. 2001) as an example of when we held that a district court abused its discretion in failing to issue sanctions under 28 U.S.C. § 1927. In *IDS*, the district court refused to issue sanctions pursuant to its "own philosoph[ical]" opposition to sanctions, even after characterizing the defendants' arguments as "dubious and disingenuous," as well as questioning the "real motive" behind the defendants' action to seek a confirmation award in a different court from the one in which the suit arose. *Id*. Against this factual backdrop, we held that the district court abused its discretion in failing to sanction the defendants for unreasonably multiplying proceedings under 28 U.S.C. § 1927. *Id*. at 654.

The facts of *IDS* are quite different from the facts here. In this case, the district court did not deny Block's motion for attorney's fees pursuant to any personal hostility to sanctions, but rather applied a bad faith standard by stating, "I know the case. I did not find anything that comes remotely close that there was no basis for the lawsuit or that it was in bad faith." Further, rather than expressing doubt about whether the claims in the lawsuit had any merit, the district court acknowledged that its summary judgment decision was a close call by stating, "I entered summary judgment in this case … . And I might be right, I might be wrong on that summary judgment … ." Simply put, the case before us is too distinct from *IDS* to dictate a finding that the district court abused its discretion by denying Block's motion for attorney's fees. Furthermore, Block fails to offer any additional compelling support for this argument.

### III. Conclusion

We AFFIRM the district court's grant of summary judgment in favor of Block and the denial of Block's motion for attorney's fees.