In the

# United States Court of Appeals

### For the Seventh Circuit

No. 16-3786

KELLY FUERY, *et al.*,

*Plaintiffs-Appellants*,

*v.*

CITY OF CHICAGO, *et al.*,

*Defendants-Appellees*.

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:07-cv-05428 — **Sara L. Ellis**, *Judge*.

ARGUED JANUARY 16, 2018 — DECIDED AUGUST 14, 2018

Before WOOD, *Chief Judge,* and ROVNER and HAMILTON, *Circuit Judges*.

ROVNER, *Circuit Judge*. After a contentious trial, the district court, after assessing the plaintiffs' contumacious conduct, asserted its inherent authority to set aside a jury verdict in favor of one plaintiff and entered judgment for the defendants on all claims. The plaintiffs challenge the limits of the judge's inherent authority to set aside a verdict. We affirm.

**I.**

Appellate courts are the proverbial Monday-morning quarterbacks. We are able to evaluate everything in slow motion, focusing a lens on what might be imperceptible in real time. But we cannot hear the grunts of the players when they are hit, smell the grass as a player slides across it, see the almost imperceptible elbow to the face, or the word mouthed by a coach to a player that is not picked up on the audio equipment. For this reason, we leave much of the trial refereeing to those on the field—the district courts. District courts "possess certain inherent powers, not conferred by rule or statute, to manage their own affairs so as to achieve the orderly and expeditious disposition of cases. That authority includes the ability to fashion an appropriate sanction for conduct which abuses the judicial process." *Goodyear Tire & Rubber Co. v. Haeger*, 137 S. Ct. 1178, 1186 (2017) (internal citations omitted). We review such a use of inherent authority for an abuse of discretion. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 55 (1991); *Salmeron v. Enter. Recovery Sys., Inc.*, 579 F.3d 787, 793 (7th Cir. 2009).

Because the relevant question in this case involves only the limits of a judge's inherent authority in the face of bad faith conduct from the parties, the highly contested facts that led plaintiffs Kelly Fuery, Debra Sciortino, and Nicole Tomaskovic to file this lawsuit in the first place are largely irrelevant. It will suffice for our purposes to report that Fuery and Chicago police officer William Szura were both driving on Interstate 55 in Chicago on a June evening in 2007 when one party did something to anger the other. Sciortino was a passenger in Fuery's car and Tomaskovic, their friend, was driving a separate car and eventually stopped on the side of the road and joined what came to be a melee. The parties disagree

as to who initiated the confrontation between the parties, and how that confrontation progressed, but all parties agree that it ended on the side of the road with yelling, a physical altercation, and claims of injury all around. The three women were each arrested for battery of a police officer, and each was ultimately acquitted following a criminal bench trial. Subsequently, the three women filed a lawsuit against the City of Chicago, Officer Szura, and several Illinois State Police employees for claims arising under 42 U.S.C. § 1983 and § 1985 (and state law claims pursuant to 28 U.S.C. § 1367), and the case eventually landed before the district court below ready for trial.[1]

In preparation for trial, the district court held proceedings on the parties' various motions in limine, in which the parties asked the court to protect certain allegedly inadmissible evidence from disclosure before the jury. Throughout the course of the trial, the defendants objected to various testimony as being violative of the court's rulings on those motions in limine and moved for a mistrial on December 9 and 13, 2015. In its December 13 motion, the City also asked the court to use its inherent authority to dismiss all claims with prejudice and award attorneys' fees to the defendants as a sanction for the conduct of the plaintiffs and their attorney. R. 405 at 1. The Illinois State Police defendants joined the motion and also asked for a mistrial. R. 408 at 1.

The district court initially denied the December 13 motion to dismiss noting that "dismissal is a very severe sanction and

---

[1] All defendants other than the City of Chicago and William Szura were eventually dismissed from the case in various manners. R. 77, 277, 420, 490.

it punishes the plaintiffs for the conduct of their attorney, which I don't think is appropriate even in light of what's happened." R. 508 at 957. But, the judge noted, "[t]here are plenty of options once the trial is concluded to deal with the misconduct that's happened, and we will deal with that at the end of trial. So I am not letting it go." *Id.*

The jury eventually returned a verdict in favor of one plaintiff, Tomaskovic, and against Szura, on her excessive force claim, granting Tomaskovic $260,000 in damages, and finding that Szura was acting within the scope of his employment at the time of the incident. R. 420. The jury found in favor of the defendants on all other claims, and the court entered judgment accordingly on January 6, 2016.

On February 3, 2016, the City filed a Rule 50(b) motion for judgment notwithstanding the verdict, or, alternatively, under Rule 60(b)(3) for relief from judgment on Tomaskovic's excessive force claim. The motion again asked the court to enter judgment against Tomaskovic as a sanction for her lawyer's pervasive misconduct at trial. R. 431 at 1, 9. At a status hearing on February 16, 2016, the court reminded plaintiff's attorney, Dana Kurtz, that the issue of sanctions was still pending and stated that it was seriously considering striking the judgment and finding for the defendants on all claims. *Fuery v. City of Chicago*, No. 07 C 5428, 2016 WL 5719442, at *13 (N.D. Ill. Sept. 29, 2016). On April 8, 2016, the City renewed its motion for sanctions under Rule 37, 28 U.S.C. § 1927, and inherent authority.

On September 29, 2016, the district court exercised its inherent authority and entered judgment in favor of the City and Szura on all claims, in effect undoing the jury's verdict in favor of Tomaskovic. But the court denied the defendants'

claims for attorneys' fees. In a thorough opinion, the district court walked through the various misconduct by the plaintiffs and their attorney, Dana Kurtz, finding that "Kurtz acted in bad faith in trying this case," and that "plaintiffs actively participated in the misconduct." *Fuery*, 2016 WL 5719442, at *10, *11.

The plaintiffs, now represented by new counsel on appeal, re-analyze each of these instances of alleged misconduct, deconstructing what happened and offering either innocence or excusable neglect, or both, as an explanation for each. Plaintiffs' counsel has done an admirable job on appeal. The arguments for each alleged violation of a ruling in limine can be somewhat convincing when viewed individually and from the sterile view of our Monday morning recliner.

As is often the case in life, however, the whole of abusive action is greater than the sum of the parts of which it is made. Were we to view judicial abuses piecemeal, each one might not be worthy of sanctions, or even comment. But these incremental abuses chip away at the fair administration of justice and frustrate a trial judge's faith that she can rely upon the lawyers before her—officers of the court—to set forth a fair and accurate presentation of the facts and law. And for this reason we leave the evaluation of such abuse to the discretion of district courts which must "manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 35, 43 (1991); see also *Tucker v. Williams*, 682 F.3d 654, 661 (7th Cir. 2012).

In this case we can see, even from the two-dimensional record, the judge's patience being tried. After one violation of the ruling in limine, the court warned Kurtz, "The last thing I will say is I don't want anymore dancing around or near or

by the rulings on the motions in limine. And if I have to deal with it again, I will say something in front of the jury, and you won't appreciate what I say in front of the jury." R. 504 at 207–08. And then a bit later, "And if you walk into rulings on motions in limine like you did today, where you asked specific questions calling—that include inadmissible hearsay in those questions, I will speak to you in front of the jury, and I will sanction you." *Id.* at 279–80. A few days later she admonished counsel that a violation of a motion in limine, was "plainly a move for sympathy… [a]nd that is inappropriate and unethical." R. 507 at 942. And a few days following that, the district court warned, "My point is that this is a continuing pattern, right, where I make rulings on motions and then you violate the rulings? … It's over and over and over and over again, and it's getting to the point where I'm at a loss. … Enough is enough. There's no reason." R. 508 at 1129–30. Finally, on the last day of trial, the judge seemed to have reached her limit, "I mean, my frustration level is through the ceiling with plaintiffs' counsel at this point. It's through the ceiling— for how this case has been litigated since this trial has started and what has and hasn't been done. … He clearly has not been instructed as to what he can say and what he can't say with regard to the motions in limine, obviously." R. 510 at 1522–23. These abuses chipped away at the integrity of the trial and led to the court's decision to enter judgment for the defendants on all counts.

## II.

The district court recognized the severity of its sanction— overturning a jury verdict and entering judgment in favor of the non-prevailing party, but yet, after carefully examining

each of the facts, the court found that, "The continuous, con-
tumacious course of conduct pursued by Kurtz, and on sev-
eral occasions aided by each of her clients and her co-counsel,
rises to the level of severity where a sanction of judgment for
the City and Szura is appropriate." *Fuery*, 2016 WL 5719442,
at *10. The district court's detailed analysis of each instance of
conduct demonstrates its dedication to ensuring that the sanc-
tion had "not been imposed lightly" but only after fair con-
sideration and weighing of the harm to the defendants. *Id.* It
is true that another district court judge may have addressed
the problem with a different set of sanctions or solutions, but
we can reverse only where no reasonable judge would have
done the same. See *Maynard v. Nygren*, 372 F.3d 890, 893 (7th
Cir. 2004). This is certainly not the case here.

The district court carefully reviewed the alleged bad faith
conduct, looking at several categories—improper questions
and attempts to elicit testimony barred by the court; failure to
properly prepare witnesses or misconduct by witnesses; lack
of candor regarding communications with the media; de-
struction of relevant notes; and other miscellaneous viola-
tions.

## A. Improper questions and attempts to elicit testimony barred by the court

The district court first focused on the plaintiffs' counsel's
questions that the court concluded were intended to elicit tes-
timony that violated its rulings on the motions in limine.
These included four categories of offenses: references to inter-
nal police investigations of Szura, references to the criminal
case and its credibility rulings, 911 calls, financial questions
and miscellaneous hearsay.

### 1. *References to any internal police investigation of Szura*

Despite barring any evidence of the internal police inves-
tigation into Szura's conduct, including mention of certain
forms involved in those investigations, Kurtz continued to
ask general questions about forms and documents that law
enforcement may have completed. For example, she asked a
police sergeant, "if you're responding to a call and you're ad-
vised that an officer pulled out his firearm, you're required to
document that, correct?" R. 503 at 71–72. She also asked,
"Doesn't the Chicago Police Department have a rule or a re-
quirement that Chicago Police Department supervisors, even
in conjunction with the Illinois State Police, are required to
investigate in certain situations?" R. 504 at 136. Despite being
warned away from such questioning, just a short while later
she asked the same questions of a different defendant, "You
are aware as a supervisor that there are certain forms either
you have to complete or you have to have the officer complete
when there is—in certain situations, correct?" *Id.* at 144. And
even after the defendants' objection to this question was sus-
tained, she tried yet again with Szura: "What other forms did
you fill out once you went back to the first district?" R. 504 at
201. Following this last instance, the court sternly warned
Kurtz during a sidebar to stop "dancing around or near or by
the rulings on the motions in limine." *Id.* at 207–08. But the
warning fell on deaf ears. A few days later Kurtz displayed a
document labeled "IPRA 0007," which the court assumed
would cue jurors about an investigation by the Independent
Police Review Authority (IPRA)—a body that the district
court judge thought would be well known to Chicago jurors,
given recent extensive news coverage of its actions. The rul-
ings in limine prohibited references to IPRA investigations.
The district court rejected Kurtz's claims of inadvertence and

instead concluded that the "improper question was not inadvertent but the result of her continued, deliberate efforts to obtain an advantage with the jury by playing fast and loose with procedure and the Court's orders." *Fuery*, 2016 WL 5719442, at *4. But even that warning was not enough. Later Kurtz asked another Trooper about internal investigations: "And would you agree that Officer Szura as an involved party should have been subject to the same type of examination as the girls?" R. 508 at 1196.

Relatedly, the district court also counted against the plaintiffs Kurtz's clear violation of the ruling in limine barring any evidence about law enforcement's failure to perform a field sobriety test or breathalyzer on Officer Szura. Rather than asking the plaintiffs if anyone had performed breathalyzer tests on them, after Fuery testified that she thought Szura had been drinking, Kurtz asked, "Was anyone given a field sobriety or breathalyzer on the scene that you saw?" R. 506 at 499. The district court correctly concluded that this question was intended to touch upon law enforcement's failure to perform a field sobriety test on Szura, in direct contradiction of the ruling in limine.

2. *References to the criminal case and the credibility rulings*

Although the plaintiffs were permitted to discuss their acquittal in the criminal case, they were not permitted to elicit testimony regarding the criminal court's assessment of Szura's credibility or that of the other police officers. The district court found that Kurtz violated this ruling in limine by asking one of the police sergeants if she was upset about the decision in the criminal case. The district court concluded that Kurtz was referring back to, and hoping to invoke prior deposition testimony in which the sergeant had testified that she

was upset by the criminal court's ruling because the criminal court judge had accused the police of misconduct. The district court concluded that this was Kurtz's improper backdoor approach to letting the jury hear that the criminal court had found misconduct by the police.

### 3. 911 calls

Just prior to Szura's testimony, the attorneys discussed admissibility of the various calls that came into the 911 call center at the time of the underlying events. The court announced that it would not rule on the admissibility of the 911 calls until Kurtz provided the transcript copies which she promised to send by email. Despite this discussion just prior to the start of Szura's testimony, during cross examination, Kurtz repeatedly asked Szura about the content of various 911 calls. The district court found not credible Kurtz's claim that she had forgotten the discussion from earlier that morning regarding admitting those calls.

### 4. Financial questions

The district court also found that Kurtz engaged in improper lines of questioning intending to garner sympathy from the jury based on the plaintiffs' financial situations. Kurtz asked Fuery why she was not able to pay off her entire legal bill for her criminal case to which Fuery responded, "I couldn't come up with the whole amount." R. 506 at 515. She then asked Tomaskovic, "In June of 2007 did you have insurance?" R. 507 at 935. The district court concluded that both of these questions were improper and irrelevant: "You wanted those jurors to know that she was self-employed and that she had no money and had no insurance and had all these bills

that are outstanding that she has not paid. And that is inappropriate and unethical." R. 507 at 942.

5. *Hearsay*

The district court also determined that Kurtz asked several questions that included impermissible hearsay in the question itself or were designed to elicit impermissible hearsay responses. Of course, even seasoned lawyers make hearsay mistakes, but it appears that the district court thought these were not made in good faith and added to the straw pile atop the camel's back.

## B. Failure to properly prepare witnesses or misconduct by witnesses

Violations of rulings in limine stem from a few main sources: lawyers who ask questions designed to elicit answers in direct violation of the rulings, lawyers who fail to properly prepare their witnesses to prevent them from stepping into forbidden territory, witnesses who intentionally testify about forbidden matters despite being prepared by lawyers, and inadvertence. After assessing the pattern in the trial and the demeanor and candor of the witnesses and counsel, the district court was not prepared to accept inadvertence as an excuse for many of the violations. In section A above, we addressed the first of these sources—improper questions by counsel. In this section we look at the remaining sources of violations— failure to prepare witnesses or intentional violations by the witnesses. In these instances, witnesses stepped into forbidden territory without the lawyer leading the way through questioning.

Ordinarily, a lawyer must prepare a client for trial by making certain that the client understands all of the preliminary

rulings and what subjects the court has forbidden. After several missteps, the district court concluded that plaintiffs' counsel "placed very little importance on ensuring their witnesses actually complied" with the rulings on the motions in limine. *Fuery*, 2016 WL 5719442, at *6. The district court surmised that this was a strategy on the part of the plaintiffs' attorney who likely believed, the court thought, that "any violations would at worst be stricken, but that the jury would have already heard the offending comment and the bell cannot be unrung." *Id.* at *6. The court's ultimate conclusion was that "[t]his tactic is extremely prejudicial to Defendants, unethical, and in this Court's opinion, it is exactly what happened in this case." *Id.* The district court judge, who witnessed the ongoing behavior and the demeanor of the attorney and the parties was in the best position to evaluate motives and veracity. After reviewing the trial transcript, we cannot say that the court abused its discretion in so concluding, particularly after looking at the conflicting and ever-morphing testimony of Kurtz and her client about trial preparation.

Sciortino was the first to step into a forbidden subject matter when she testified that she had never been arrested or convicted before. She volunteered this information as she was describing why she thought she would be released quickly from jail and therefore did not seek medical attention while incarcerated. R. 507 at 759–60. The district court found that although Kurtz did not directly solicit this testimony, it was indicative of her failure to properly prepare her clients.

It seems likely that this episode standing alone would have passed relatively unnoticed but for the district court's greater concerns about Tomaskovic's violations of the rulings

in limine. First Tomaskovic testified regarding a medical diagnosis rather than merely describing what ailed her as required by the motion in limine. R. 507 at 932. The district court did not make much of this, merely mentioning it in passing. *Fuery*, 2016 WL 5719442, at *5. But the district court's frustration began in earnest when Tomaskovic offered testimony in violation of a ruling prohibiting discussion of the plaintiffs' pressing criminal charges against Szura. R. 507 at 918. The district court called for a side bar conference and said to Kurtz,

> I don't understand what part of my rulings on the motions in limine you don't get. … You need to work with your clients and prep your clients and be very direct in talking to your clients and explain to them what they can say and what they can't. … It is 'the judge has said you are not allowed to ever mention the words "pressing charges" to come out of your mouth, period.'

*Id.* at 919–20 (internal quotation marks added). In response, Kurtz assured the judge that she had indeed done just that and that she had been very clear with her client. The district court judge responded that given Kurtz's earlier misconduct (which we describe in later sections), she had a "hard time believing that [she was] not playing fast and loose and playing to win here and being unethical." *Id.* at 923. The court warned:

> I am going to spend the weekend thinking about how this trial has been going and what's been happening so far and whether there should be any sanctions, up to and including a mistrial, because I've had enough. This has pushed me over the line. I have a lot of patience

and a lot of tolerance, and I'm done. I'm done
with the funny business.

*Id.* at 924–25.

The court dismissed the jury for the day and questioned Tomaskovic directly about whether she had been properly prepared for trial and whether her lawyer had told her about the things she could not say during trial. Tomaskovic denied that she had been so instructed. The court asked, "Were you ever instructed by your lawyer that you weren't allowed to say [that you wanted to press charges]?" *Id.* at 939. Tomaskovic answered, "No." *Id.* Based on this statement, the defendants' respective counsels informed the court that it would likely move for a mistrial. Kurtz continued to insist that she had properly prepared her clients and that Tomaskovic was simply confused. The judge, however, who had heard her testimony, witnessed her demeanor, and watched the overall processes at trial was not convinced. In fact, she was quite frustrated:

> I asked her specifically whether she had been instructed that she was not allowed to say that she wanted to press charges. Specifically. And she said no. That's not a hard question. You don't have to do any kind of interpretation to understand what I am asking when I ask that question. And she said no. She doesn't seem to me, even though she was emotional, she doesn't seem stupid. She understood what I was asking her. And she answered me.

*Id.* at 941–42.

Following this discussion of mistrials and ethical violations, the plaintiffs' case was, no doubt, on thin ice. A few minutes after Kurtz left the courtroom, Tomaskovic re-entered and asked to address the court. She stated, on the record, that no one had spoken to her about her testimony, that she had misunderstood the earlier questions from the court, and that Kurtz had indeed explained to her that she could not say certain things, such as "pressing charges, and the other one was about something about doctors, doctors diagnoses or something like that. I know there was a few others." *Id.* at 950.

The court was not convinced and found this explanation to be "ludicrous." *Fuery*, 2016 WL 5719442, at *5. The court concluded that the more likely scenario was that Kurtz or her agent told Tomaskovic that her testimony could lead to a mistrial and that she needed to correct the problem by lying about her level of preparation. The other possibility, the court concluded, was that Kurtz did properly prepare Tomaskovic and yet the client deliberately chose to offer improper testimony and only recanted when she learned of the potential for a mistrial. Either way, the court concluded, "Tomaskovic acted abusively toward the judicial process." *Id.*

Shortly after Tomaskovic asked to address the court, Fuery and Sciortino also entered the courtroom and requested to address the court. On the record, both stated that Kurtz had instructed them regarding the rulings in limine prior to trial. The district court concluded that it was unlikely that Fuery and Sciortino would have decided to come back into the courtroom to address the court on their own initiative, thus supporting the finding that Kurtz or her agent instructed her clients to inform the judge that they had been prepared on the rulings in limine.

The plaintiffs complain that the district court's inquiries about whether Kurtz properly prepared Tomaskovic for trial violate the attorney-client privilege. The judge asked a very limited question about whether Tomaskovic had been informed about the rulings in limine and instructed how to proceed accordingly. It required a "yes" or "no" answer (and, in fact, this is what the judge received—a "no" and "No, not specifically." R. 507 at 938, 939). The court's order on the motions in limine was a public document. The contents of it were not subject to any privilege and the plaintiff and her counsel had no protected privilege if they conspired to violate the court order. We find this argument to be a red herring. Moreover, all three plaintiffs came back into the courtroom of their own volition to discuss their preparation for trial, thus waiving any privilege if it had existed. See *Appleton Papers, Inc. v. E.P.A.*, 702 F.3d 1018, 1024 (7th Cir. 2012).

The plaintiffs also object to the district court's conclusion that Tomaskovic either lied about being prepared or deliberately violated the rulings in limine. The plaintiffs claim that a third possibility—that Tomaskovic was nervous and overwhelmed by the proceedings and inadvertently misspoke—was the more likely scenario. The district court, as the arbiter of candor and demeanor, determined, "If this had been the first instance, I would be much more likely to believe that she was emotionally overwrought, didn't understand what I was asking and didn't have a clue about what was going on. But she understood, and she understood me, and she knew exactly what I was asking." R. 507 at 943. This court will not overturn the district court's credibility findings unless "after reviewing all the evidence, we are left with a definite and firm conviction that a mistake has been made. … In other words, a

district court's credibility findings are binding on appeal unless the court has chosen to credit *exceedingly* improbable testimony." *Hernandez v. Cardoso*, 844 F.3d 692, 695 (7th Cir. 2016). We see no reason to overturn the court's credibility finding on this matter.

One would assume that after all of the warnings and a near mistrial, Kurtz would have given each witness a thorough remedial course on the preliminary rulings, yet Kurtz's expert stepped point blank into forbidden territory as well.

The question as to whether Szura acted as an officer or as a private citizen was in the hands of the jury and forbidden, by preliminary ruling, from mention by experts. Nevertheless when Kurtz asked her witness, "Why is it important to announce that you're a police officer?" The expert answered: "Because … He's acting as a police officer." R. 510 at 1519. After all of the time spent warning Kurtz to prepare her witnesses properly, the district court judge declared her "frustration level is through the ceiling." R. 510 at 1522. The district court concluded, in its ruling, that the violations were prejudicial and unethical. We do not have reason to question the district court's finding.

## C. Communications with the media

Following the first day of trial, both the district court and the City's counsel independently noticed an article on the front page of the *Chicago Tribune* about the trial with links to audio files and transcripts of 911 calls and still photos from the "day in the life" video of Tomaskovic that her counsel had requisitioned to demonstrate her physical condition around the time of her surgery. None of these exhibits had been ad-

mitted into evidence. The district court, concerned about improper influence of the article on the jury, began an investigation into how the *Chicago Tribune* procured the material. Kurtz vehemently denied providing the material to the reporter, claiming that the only thing she said to the reporter after the first day of trial was "no comment." She adamantly stated to the court, "I will swear to you I did not send [the photograph] to him. I will confer with my clients, but I can also assure you that they did not either." R. 505 at 289.

The court's investigation of the leak continued with inquiries of all counsel, interviews of court staff, inquiries into Illinois State Police FOIA requests, and by summoning the reporter who ultimately refused to name his source. The court spent significant time and resources trying to unravel the origin of the disclosure.

During the investigation, the attorney for the City informed the court that he had notified Kurtz about the *Tribune* article when Kurtz arrived at court at 8:50 a.m. the day of publication. Kurtz denied sending the material to the *Tribune* and exited the courtroom. She returned a few minutes later stating that she did not see any transcripts linked to the article. The City's attorney noted to the court that the article was modified at 8:58 a.m.—during the exact time that Kurtz was out of the courtroom. He was later able to locate an electronically cached copy of the 911 transcript attached to the article which included the marking, "Plaintiffs' Exhibit 4." Only the plaintiffs and anyone to whom they had sent it possessed this particular copy of the transcript. The court clerk's office confirmed that it was not in possession of the audio files and no one had attempted to access the publicly filed version of the

transcript (which would not, in any event, have had the "Plaintiffs' Exhibit 4" marking).

Before lunch the court once again questioned Kurtz about whether she provided a photograph to the press. Kurtz once again adamantly insisted, "I did not give it to him, Your Honor, and I swear on that. I did not give it to him." R. 505 at 307. The court then asked if she had given the press the "day in the life" photo in 2013. Kurtz replied: "I don't think so … I would have to check." R. 505 at 308. After twice "swearing to the court" that she had not provided the reporter with the "day in the life" photograph, following lunch she conceded that she had indeed provided the reporter with the "day in the life" video two years prior—in December 2013. She continued to deny sending him the 911 transcript. She also altered her story regarding her interaction with the *Tribune* reporter the day before, explaining: "So and then last night Mr. Meisner was downstairs , and I told him that things were excluded from the case and they cannot be—they're not in the trial." R. 505 at 316. When the district court asked about the inconsistency with her prior report, she explained that she "just remembered that [she] said 'no comment,' to him" but that her co-counsel had recalled the details differently and reminded her. *Id.* at 317–18 (quotation marks added). The district court did not find the explanation to be credible. Although the district court stated that it could not conclusively determine how the *Tribune* obtained the transcript and audio recording, it assumed that, in light of the evidence and "general lack of respect and candor displayed by plaintiffs' counsel throughout the trial, in addition to Kurtz's shifting recollection of events," the most likely scenario was that Kurtz or someone working at her direction had provided the material to the media. *Fuery*, 2016 WL 5719442, at *8. The court concluded that "regardless

of how the materials were provided to the media, the most
egregious violation in this instance was Kurtz's dishonesty to
the Court in response to its investigation of this issue." *Id.* at
*8. After interviewing the jurors, the court determined that
they were not prejudiced by the article, but that the whole is-
sue was a distraction to the proceedings and the opposing
side.

The plaintiffs argue that the district court's sanctions vio-
late the First Amendment by punishing counsel for her com-
munications with the media. The plaintiffs' discussion of law-
yers' rules of professional conduct regarding statements to
the media is irrelevant and we need not explore the legitimacy
of a court's restrictions of communications with the media
during trial. As we stated at the start, the court did not sanc-
tion the plaintiffs for any one particular act, but to the extent
that the media communications issue made up a larger bun-
dles of straws on the camel's back, the court made clear that
the primary violation was not necessarily the contact with the
media, but "the most egregious violation in this instance was
Kurtz's dishonesty to the Court in response to its investiga-
tion of the issue." *Fuery*, 2016 WL 5719442, at *8. Between the
suspicious timing of the alteration to the *Tribune* article and
Kurtz's shifting explanations and recollections, the court was
entitled to factor lack of candor into its decision on sanctions.

### D. Destruction of notes

Perhaps nothing caused more rigmarole and distraction
for the court than the skirmish over Fuery's missing notes.
Once again, because our only task is to determine the outer
limits of the court's inherent authority, we need not describe
the course of events in as much detail as the district court did.
(Those details are available at *Fuery*, 2016 WL 5719442, at *8–

9). We note, however, that while considering sanctions, the district court thoroughly explored and aired what happened to the missing notes and the forthrightness of the parties in their explanations. The summarized version of events is as follows:

During the cross examination of plaintiff Fuery, Szura's attorney asked Fuery about a set of notes she had written the morning after the altercation with Officer Szura which memorialized and detailed the incident. Fuery confirmed that she did indeed write a set of notes and took them to a meeting with Kurtz and "gave them to her." R. 506 at 589. This surprised defense counsel because Fuery had testified at her deposition that she had discarded the notes after meeting with Kurtz. In short, Fuery's initial testimony at the deposition (we will call this version 1) was that she made notes after the incident at the direction of a state trooper and then she discarded the notes after her meeting with Kurtz. R. 252-2 at 447. At trial (version 2), she testified that she gave the notes to Kurtz and did not throw them out. The surprise led to a side bar conference wherein Kurtz told the court that she directed the plaintiffs to make the notes and thus they were privileged (version 3). The court then called Fuery back into the courtroom for clarification and she reiterated that she made the notes at the direction of the trooper, not Kurtz, and that she gave those notes to Kurtz (version 4). After Fuery left the courtroom, Kurtz again insisted that she had only one set of notes—those that she had directed the plaintiffs to make and that she was unaware of any document request that would have required her to disclose them (version 5). The court, with the defendants' help, however, pointed out several document requests to which the notes would have been responsive. At this point,

and after a break in the trial, Kurtz stated that she had re-
viewed her records and determined that she instructed the
plaintiffs to create a *different* set of notes (presumably thus
privileged) several months after the incident, rather than days
later as she had stated in the morning, that Fuery must have
been thinking about notes she took to her criminal attorney,
that she (Kurtz) did not receive any notes a few days after the
incident, and that Fuery threw them away (version 6). For the
final version (version 7), Fuery returned to the courtroom and
assured the court that she had not spoken with anyone about
her testimony while she was out of the courtroom, but yet re-
versed her trial testimony and went back to her original dep-
osition account, stating that she threw out her own notes and
did not leave them with Kurtz. R. 506 at 625. She also con-
firmed that she was not confusing the meeting with her crim-
inal defense lawyer with her meeting with Kurtz. The court
found "the reversal of her testimony at trial to be highly sus-
picious and likely the result of improper coaching by Kurtz or
someone working for her attorney during the recess." *Fuery*,
2016 WL 5719442, at *9.

In the end, the district court threw up its hands conclud-
ing:

> The Court need not determine which set of facts
> is the truth. Whether Fuery gave the notes to
> Kurtz as she testified at trial, or threw them out
> after meeting with Kurtz or some other attorney
> as she stated during her deposition, the notes
> were not available to Defendants, and this prej-
> udiced them. Furthermore, Kurtz's behavior
> when addressing this issue during trial was just

> another example of her staking out the most favorable position to herself and only backing down, incrementally, when presented with facts that contradicted her preferred narrative. … Not only are these shifting explanations unfair to Defendants and deceptive to the Court, they caused the Court and Defendants to waste a great deal of time attempting to sort out the truth.

*Fuery*, 2016 WL 5719442, at *9. Consequentially, the court gave the jury a spoliation instruction informing them that they could "assume that such evidence would have been unfavorable to plaintiffs only if you find by a preponderance of the evidence that, one, plaintiffs intentionally destroyed the evidence; and, two, plaintiffs destroyed the evidence in bad faith." R. 510 at 1652. The court, however, determined that the spoliation instruction was insufficient as a sanction for Kurtz's and Fuery's behavior and that it could also form one of the bases for the sanction that the court ultimately chose—entry of judgment for defendants. *Fuery*, 2016 WL 5719442, at *9.

The plaintiffs argue that Fuery's disposal of her notes was no worse than defendant Illinois State Police Special Agent Aragones' destruction of his notes after he completed his report of the incident. Aragones, however, destroyed his notes after transferring them to a formal report as part of his regular professional practice and procedure. Fuery, who had no such regular professional practice, discarded her notes that she brought to her counsel's office despite the fact that she intended to initiate a lawsuit in which the notes would be relevant. See *Trask-Morton v. Motel 6 Operating L.P.*, 534 F.3d 672,

681 (7th Cir. 2008) (a party has a duty to preserve evidence when it knows or should know that litigation is imminent).

### E. Miscellaneous misrepresentations

The district court also made findings about various other misrepresentations to the court including misstating the Federal Rules of Evidence, misstating a ruling on a motion in limine and others. We need not address these in detail for we find that the district court set forth ample evidence to support its use of its inherent authority to enter judgment for the defendants.[2]

### III.

After setting forth all of the misconduct in detail, the district court concluded that "Plaintiffs' trial counsel engaged in repeated misconduct throughout the trial and that Plaintiffs actively participated in the misconduct." *Fuery*, 2016 WL 5719442, at *1. Consequently the court used its inherent authority to enter judgment in favor of the City and Szura on Tomaskovic's excessive force claim and grant the City's motion for sanctions with respect to Fuery and Sciortino's claims, because the court concluded that "both of them participated in the misconduct at trial and are equally accountable for the misconduct of their attorney." *Id.*

A federal court's inherent authority is an implied power that emanates from the nature of the institution and the need to "impose silence, respect, and decorum, in their presence,

---

[2] The plaintiffs dedicate a page to the court's ruling that Tomaskovic violated a ruling in limine by referring to her herniated and bulging disc. Plaintiffs' Brief at 17. The district court barely mentioned this violation, raising it only insofar as it touched upon whether she had been properly prepared for testimony by her attorney. *Fuery*, 2016 WL 5719442, at *5.

and submission to their lawful mandates … so as to achieve the orderly and expeditious disposition of cases." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991) (internal citations omitted). Most relevant to this case is the federal court's power to vacate its own judgment upon proof that a fraud has been perpetrated upon the court. *Id.*at 44. A court may use its inherent authority to sanction those who show "willful disobedience of a court order," act in "bad faith, vexatiously, wantonly, or for oppressive reasons," for fraud on the court, delay, disruption, or "hampering enforcement of a court's order." *Id.* at 45–46. A court's inherent authority is broad: "Courts traditionally have broad authority through means other than contempt—such as by … entering default judgment—to penalize a party's failure to comply with the rules of conduct governing the litigation process." *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 833 (1994). See also *Barnhill v. United States*, 11 F.3d 1360, 1367 (7th Cir. 1993) ("Moreover, pursuant to this power, a court may impose the severe sanction of dismissal with prejudice (or its equivalent, judgment) if the circumstances so warrant."). This power is particularly broad where the bad faith conduct occurs within the presence of the court (thus making fact-finding unnecessary) and where the court uses the sanction to maintain "the integrity of the trial process." *Id.* at 832. Such is the case here.

A district court may impose sanctions under its inherent authority "where a party has willfully abused the judicial process or otherwise conducted litigation in bad faith." *Tucker v. Williams*, 682 F.3d 654, 661–62 (7th Cir. 2012). The court must first make a finding of "bad faith, designed to obstruct the judicial process, or a violation of a court order." *Id.* at 662. Mere clumsy lawyering is not enough. *Id.* As the district court

noted, and this court has said, issuing a judgment is a "powerful sanction" and one that should be used judiciously after determining that there is "a clear record of … contumacious conduct" after considering "the egregiousness of the conduct in question in relation to all aspects of the judicial process" and considering whether less drastic sanctions are available. *Barnhill*, 11 F.3d at 1367–68 (citing *Webber v. Eye Corp.*, 721 F.2d 1067, 1069 (7th Cir. 1983)). See also *Chambers*, 501 U.S. at 44 ("[b]ecause of their very potency, inherent powers must be exercised with restraint and discretion."). That power is at its pinnacle, however, when contumacious conduct threatens a court's ability to control its own proceedings. *Mine Workers*, 512 U.S. at 832. As we discuss below, the less immediate the court's need, the more due process it ought to provide before imposing sanctions. *Id.* Although part of a court's consideration should be on the impact or effect that the conduct had on the course of the litigation, there is no requirement that the district court find prejudice. *Id.* Nor is there a requirement that a district court impose graduated sanctions. "[T]he appropriateness of lesser sanctions need not be explored if the circumstances justify imposition of the ultimate penalty—dismissal with prejudice." *Dotson v. Bravo*, 321 F.3d 663, 667 (7th Cir. 2003).

We find that the district court considered all of this—the egregiousness of the conduct, the effect on the course of the litigation and the possibility of lesser sanctions. The district court made very thorough findings regarding the plaintiffs' bad faith conduct. The court was convinced that this was not a case of clumsy lawyering, but that "the continuous, contumacious course of conduct pursued by Kurtz, and on several occasions aided by each of her clients and her co-counsel, rises to the level of severity where a sanction of judgment for the

City and Szura is appropriate." *Fuery*, 2016 WL 5719442, at
*10. The court concluded that the misconduct was repeated,
frequent, willful and intentional; wasted the court's time with
sidebars and investigations; unfairly distracted the defend-
ants' counsel from time it could have been preparing the mer-
its of its defense; and prejudiced the defendants. As a result,
the court concluded that the factual findings supported the
court's decision to issue a judgment in favor of the defendants
as a sanction in this case and that lesser sanctions were not
appropriate. *Id.* at *2,*11. We find that the court articulated
valid bases on which to sanction the plaintiffs using its inher-
ent authority. See *Tucker*, 682 F.3d at 662.

The plaintiffs counter the district court's catalogue of in-
fractions by attempting to unravel each violation and demon-
strate its inconsequential nature. And, in fact, when explained
by the plaintiffs in this way, many of the violations may seem
trivial (others, however, not at all). But once again, it is the
district court who can evaluate the whole ball of wax and de-
termine whether the small incremental blows to the integrity
of the trial add up to something that requires sanctioning.
Death by a thousand cuts is no less severe than death by a
single powerful blow.

We also find that the plaintiffs had sufficient due process.
As we noted, the amount of process required depends on the
nature of the sanction and the nature and severity of the con-
duct. Contumacious conduct that occurs in the presence of the
court and disrupts the fairness and integrity of the judicial
process requires less process than out-of-court conduct sub-
ject to criminal sanctions. See *Mine Workers*, 512 U.S. at 831–
34. For example, "petty, direct contempts in the presence of

the court traditionally have been subject to summary adjudication, to maintain order in the courtroom and the integrity of the trial process in the face of an actual obstruction of justice." *Id.* at 832. This court has held that no warning is required for sanctions where the conduct is severe and the party represented. *Matter of Bluestein & Co.*, 68 F.3d 1022, 1026 (7th Cir. 1995). But even if warning were required, the plaintiffs had plenty. For example, the court warned plaintiffs' counsel on many occasions of the possibility of sanctions and mistrial:

• "I don't intend to have this trial be a circus, and I won't allow it to be a circus. … you will get sanctioned. … If I find that people violate orders on motions in limine, I won't hesitate to sanction you." R. 502 at 4–5.

• "I don't want anymore [sic] dancing around or near or by the rulings on the motions in limine. And if I have to deal with it again, I will say something in front of the jury, and you won't appreciate what I say in front of the jury." R. 504 at 207–08.

• "You have apologized up one side and down the other. And frankly, when you have to apologize over and over and over again, you need to stop and think, 'Why do I need to keep apologizing? What am I doing? Because if I have to keep apologizing over and over again, I must be doing something that I shouldn't be doing.'" R. 504 at 277.

• "And if you walk into rulings on motions in limine like you did today, where you asked specific questions calling— that include inadmissible hearsay in those questions, I will speak to you in front of the jury, and I will sanction you." R. 504 at 279–80.

• "If I find out that [the *Tribune* reporter] received this information from the plaintiffs or plaintiff's counsel, because I'm at a loss as to where he got that photograph, if I find out it came from plaintiffs or plaintiff's counsel, I will be making a referral to the ARDC, so you're on notice." R. 505 at 296.

• After investigating the *Tribune* story the court "reserve[d] [its] right to finish up this investigation at the conclusion of the trial." R. 505 at 318.

• "I have to say that your conduct with regard to this trial thus far has been inexcusable." R. 505 at 318.

• "So you are going to live with the consequences of your mistakes. … And I am going to hold everyone, all the lawyers, to the conduct that I expect in this courtroom. People cannot play fast and loose with the rules." R. 505 at 362.

• "I am going to spend the weekend thinking about how this trial has been going and what's been happening so far and whether there should be any sanctions, up to and including a mistrial, because I've had enough." R. 507 at 924.

• "I mean, the nonsense that has been pulled in this trial is unbelievable. And it is one thing after another. It is asking inappropriate questions such as do you have insurance. How on earth is that relevant? It is not relevant. Moreover, it is prejudicial. And you know it. … You wanted those jurors to know that she was self-employed and that she had no money and had no insurance and had all these bills that are outstanding that she has not paid. And that is inappropriate and unethical. Asking questions that in the body of the question contain inadmissible hearsay is unethical and improper. Talking to a reporter about your case while the case is being tried is unethical. And what you said about what you said to him went from

'no comment' to 'don't publish the stuff that's been excluded,' which of course begs the question that you have already been speaking to him and he knows what's been excluded and what hasn't been, unethical." R. 507 at 941–42 (quotation marks added).

• Denying a motion for mistrial for the time being but noting that "[t]here are plenty of options once the trial is concluded to deal with the misconduct that's happened, and we will deal with that at the end of the trial. So I'm not letting it go." R. 508 at 957.

• "[M]y frustration level is through the ceiling with plaintiffs' counsel at this point. … He clearly has not been instructed as to what he can say and what he can't say with regard to the motions in limine, obviously." R. 510 at 1522–23.

The court held several mini-evidentiary hearings—questioning the plaintiffs under oath about their preparation, speaking with the *Tribune* reporter, the attorneys and the clerk's office. The City requested sanctions on December 13, 2015 (R. 405), January 5, 2016 (R. 419); February 3, 2016 (R. 431); and April 8, 2016 (R. 461). Moreover, it goes without saying and hardly needs citation that a court need not warn a plaintiff, and particularly not a lawyer, that it may not lie to a court. See, e.g., *Ayoubi v. Dart*, 640 F. App'x 524, 529 (7th Cir. 2016) ("no one needs to be warned not to lie to the judiciary.") (citing *Mathis v. N.Y. Life Ins. Co.*, 133 F.3d 546, 547 (7th Cir. 1998)). The defendants' motion under Rules 50(b) and 60(b)(3) after trial certainly should have given plaintiffs adequate notice of the potential for a judgment against them. See R. at 431. But if it did not, the defendants filed a renewed motion on April 8, 2016 "in order to provide plaintiff with an additional opportunity to offer any explanation available as to how and

why this occurred at trial." *Id.* at 2. And at a status conference on February 16, 2016, the district court reminded the plaintiffs that a motion for sanctions was still pending and she was considering striking the judgment. *Fuery*, 2016 WL 5719442, at *13. One might debate how much process is required under the facts of this case, but whatever might be required, the plaintiffs certainly had sufficient notice of the possibility of sanctions up to and including a mistrial or judgment for the defendants.

Additionally, we find that the district court adequately addressed the plaintiffs' concerns that the clients were being punished for the actions of their attorney. The court determined first, that the plaintiffs participated in the misconduct. The court found that either Tomaskovic willfully disobeyed the court's rulings in limine as conveyed to her by her attorney or that she lied to the court about being properly prepared by her attorney. Either way, the court concluded, she participated in bad faith conduct. Moreover, the court concluded, as things unfolded with Tomaskovic's late-in-the-day (literally and figuratively) alteration in testimony about trial preparation, the latter explanation for her behavior (that she was not honest about being properly prepared) was more likely. This, the district court concluded, was a more egregious violation, as "dishonesty to the Court alone is sufficient to merit dismissal of a claim." *Fuery*, 2016 WL 5719442, at *12. See *Montaño v. City of Chicago*, 535 F.3d 558, 563 (7th Cir. 2008) ("A district court has inherent authority to sanction conduct that abuses the judicial process"); *Allen v. Chicago Transit Auth.*, 317 F.3d 696, 703 (7th Cir. 2003) ("it is arguable that a litigant who defrauds the court should not be permitted to continue to press his case."). The district court adequately supported the conclusion that there had been fraud on the court. The district

court judge made a factual finding that the questions the court asked Tomaskovic about being prepared by her attorney were clear and not confusing; Tomaskovic answered them without trouble or equivocation; the timing of her change to the story was extremely suspicious, as was her claim that no one had spoken to her about her testimony. *Fuery*, 2016 WL 5719442, at *5. The district court made similar findings about Fuery and Sciortino's testimony about their trial preparation. *Id.* at *6. The court also found that Fuery gave false testimony about her handwritten notes. *Id.* at *12.

But the district court noted in the alternative that even if the plaintiffs themselves had not engaged in bad faith conduct, a court may enter judgment as a sanction even where only the attorney and not the plaintiffs participated in the misconduct. *Id.* at *12. See *Ball v. City of Chicago*, 2 F. 3d 752, 757 (7th Cir. 1993). "The clients are principals, the attorney is an agent, and under the law of agency the principal is bound by his chosen agent's deeds." *United States v. 7108 W. Grand Ave., Chi., Ill.*, 15 F.3d 632, 634 (7th Cir. 1994). See also *Easley v. Kirmsee*, 382 F.3d 693, 698 (7th Cir. 2004) (a client can bear the consequences of her attorney's neglect and contemptuous conduct in a case). Given the record of misconduct by Kurtz, the district court declared that a finding of plaintiff misconduct was not required to support a sanction of judgment for defendants. We agree, but also have no reason to doubt the district court's finding that the parties participated in the dishonest conduct too.

This also puts to rest the plaintiffs' complaint that the sanctions for Sciortino and Fuery were disproportionate to their alleged misconduct. The plaintiffs claim that Sciortino's only fault was a "slip of the tongue" that she had no criminal

record. And that Fuery's only sin was destroying her notes — something that even one of the Special Agents stated that he did as well. This argument ignores completely the district court's finding that Sciortino and Fuery conspired either with Kurtz or her agent to mislead the court about their level of preparation for trial (or, in the alternative, their purposeful violations of the rulings in limine). It also ignores the fact that the plaintiffs were responsible for the conduct of their attorney. In short, plaintiffs' complaints that the sanctions are disproportionate to the gravity of the conduct are essentially plaintiffs' request for a different weighing of the conduct and injury. Perhaps another district court judge may have concluded otherwise on this matter, but we cannot say that the district court judge here, evaluating all of the evidence and weighing all of the testimony, abused her discretion. We see no basis to overturn her conclusion that all three plaintiffs participated in the bad faith conduct in a significant way.

Along with the consideration of the plaintiffs' conduct, the district court was also entitled to examine, as one factor in its consideration, the modus operandi of the attorney as evidenced by her prior disciplinary history. Less than a year before the trial, this court, in an entirely separate matter, described a string of misconduct by Kurtz in a trial in the district court below and noted that she had a substantial disciplinary history. *Rojas v. Town of Cicero, Ill.*, 775 F.3d 906, 909–10 (7th Cir. 2015). The *Rojas* panel highlighted that history with a string cite of seven cases in which Kurtz had been disciplined. *Id*. It also noted that, "Kurtz's unwillingness to conform her conduct to requirements laid down by judicial orders or rules of procedure is unlikely to change unless courts respond firmly." *Id.* at 910. And indeed, we were correct.

The plaintiffs complain that the district court's reliance on this case was an invalid reason to grant sanctions. The district court, however, made clear that its holding was not dependent on a reference to *Rojas*, but that the court's conclusion about bad faith and sanctions was "amply supported by the record in this case alone." *Fuery*, 2016 WL 5719442, at *11.

We do not see why, in any event, the district court could not consider Kurtz's disciplinary history. Indeed, a prior panel of our court encouraged courts to do just that. *Rojas*, 775 F.3d at 910. (encouraging courts to respond to Kurtz's unwillingness to conform her conduct to requirements laid down by judicial orders or rules of procedure firmly). It is true that when presenting evidence to a jury we keep propensity evidence out of the mix to prevent a jury from concluding that a person acted in accordance with some characteristic or trait. See Fed. R. Evid. 404(b). In this case, however, the court was acting on its own, under its inherent authority to rectify abuses to the judicial system by an attorney whose job it is to aid the court in the administration of justice. Courts must rely on attorneys—officers of the court—to uphold rules and operate with integrity and honesty in the courtroom. Almost 200 years ago the Supreme Court in its early years explained, "it is extremely desirable that the respectability of the bar should be maintained, and that its harmony with the bench should be preserved." *Ex parte Burr*, 22 U.S. (9 Wheat.) 529, 530, 6 L.Ed. 152 (1824). When an attorney repeatedly violates the standards and oaths of the profession, then a court may take notice of that attorney's disciplinary history when evaluating whether sanctions are appropriate. *Rojas* at 909 (7th Cir. 2015). Here, however, the record amply supports the sanctions with or without considering Kurtz's disciplinary history.

We need not address all of plaintiffs' arguments about the timing of the sanctions, and the motions initiating them. The sanctions here were not issued pursuant to the Rule 50(b) and Rule 60(b)(3) motions; they were issued pursuant to the court's inherent authority. A court may invoke its inherent authority to sanction *sua sponte*. *Chambers*, 501 U.S. at 49. And sanctions may be imposed years after a judgment on the merits. *Id.* at 56.

In sum, we can conclude with confidence that the district court was well within its discretion in using its inherent authority to enter judgment in favor of the defendants. We could end the discussion here, but for the fact that just a few months after the decision, the Supreme Court issued its opinion in *Goodyear Tire & Rubber Co. v. Haeger*, 137 S. Ct. 1178, 1184 (2017), addressing inherent authority and sanctions. In *Goodyear*, some months after settlement, the district court learned that the defendant had knowingly concealed a highly relevant and inculpatory document. *Id.* at 1184. The court could not take its preferred action—entry of a default judgment—because the case had already settled. *Id.* Instead it ordered the offending party to reimburse the other party for all attorneys' fees and costs paid during the course of the litigation. *Id.* The Supreme Court, however, concluded that although the district court had the inherent authority to sanction the party for its conduct—even long after the settlement of the case—the court could only award attorneys' fees that were compensatory and not punitive. *Goodyear*, 137 S. Ct. at 1186 (citing *Mine Workers*, 512 U.S. at 834). Thus, the Supreme Court held, a court must "calibrate[] the damages caused by the bad-faith act on which it is based." *Id.*

We have considered whether the *Goodyear* requirement to calibrate the sanction to the bad-faith acts also applies to sanctions other than an award of attorneys' fees, like the order of judgment here. We have reason to doubt that it does. The Supreme Court has instructed that sanctions such as "entering default judgment [] to penalize a party's failure to comply with the rules of conduct governing the litigation process … have never been considered criminal." *Mine Workers*, 512 U.S. at 833. But even assuming (without deciding the matter) that the holding in *Goodyear* does apply to sanctions other than attorneys' fees, we are confident that the district court exercised reasonable discretion in reversing the judgment for Tomaskovic and entering judgment for the defendants across the board.

Under *Goodyear*, calibrating the sanction to the bad faith conduct only requires "rough justice" and not accountant-like precision. *Goodyear*, 137 S. Ct. at 1187 (citing *Fox v. Vice*, 563 U.S. 826, 838 (2011)). And part of such rough justice might result in more sweeping sanctions when the bad faith conduct has infected the entirety of the proceedings. See *Chambers*, 501 U.S. at 51; *Goodyear*, 137 S. Ct. at 1187–88. In this case, the district court went through the laundry list of bad faith conduct of the plaintiffs and their counsel and concluded that fairness required a judgment for the defendants. It is true that the district court used some language of punishment, but what is also clear is that the district court assessed the total effect of the misconduct on the integrity of the proceedings and issued a sanction which would "maintain … the integrity of the trial process." *Mine Workers*, 512 U.S. at 832. And after assessing the misconduct as a whole, the district court determined, as it had discretion to do, that the most reasonable sanction in this

case was the entry of judgment for the defendants. We find no abuse of discretion whatsoever.

Plaintiffs have also asked this court to reverse the judgment entered against Fuery and Sciortino and remand for a new trial. For the same reasons as articulated above, we conclude that the district court did not err in denying the plaintiffs' motion for a new trial. The district court did not abuse its discretion by issuing a judgment in favor of the City of Chicago and Szura on all claims. Accordingly, the judgment of the district court is AFFIRMED in all respects.