In the

# United States Court of Appeals
## For the Seventh Circuit

No. 18-2759

DEON PATRICK,

*Plaintiff-Appellee,*

*v.*

CITY OF CHICAGO, et al.,

*Defendants-Appellants.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 14 C 3658 — **Ronald A. Guzmán**, *Judge.*

ARGUED SEPTEMBER 13, 2019 — DECIDED SEPTEMBER 8, 2020

Before SYKES, *Chief Judge*, and BAUER and ROVNER, *Circuit Judges*.

SYKES, *Chief Judge*. Deon Patrick was convicted of double murder in 1995 and sentenced to life in prison. The convictions were vacated in 2014 and Patrick was released. The Cook County Circuit Court issued a certificate of innocence, *see* 735 ILL. COMP. STAT. 5/2-702, and Patrick then filed suit for wrongful conviction against seven Chicago police officers and two prosecutors who investigated and prosecuted

him. He alleged several constitutional claims under 42 U.S.C. § 1983 and state-law claims for malicious prosecution and civil conspiracy. The City of Chicago, also a defendant, stipulated to liability if any of its officers were found responsible for violating Patrick's rights. A jury exonerated the prosecutors and one officer but found six officers liable and awarded more than $13 million in compensatory damages and punitive damages in varying amounts.

The defendants raise several errors on appeal. First, they claim that the district judge should have dismissed the case as a sanction for Patrick's acknowledged perjury during discovery. Second, they challenge the judge's decision to admit the certificate of innocence at trial, arguing that it was unfairly prejudicial, either alone or in combination with certain statements by Patrick's lawyer during closing argument. Finally, they point to an error in the jury instruction on Patrick's due-process claim.

We affirm. The judge's ruling on the sanctions question was a reasonable exercise of his discretion, and it was not improper to admit the certificate of innocence into evidence at trial. The jury instruction contained an error, but it was harmless under the circumstances of this case.

## I. Background

On November 16, 1992, at about 8:43 p.m., Jeffrey Lassiter and Sharon Haugabrook were fatally shot in Lassiter's apartment on Chicago's north side. The investigation focused on members of the Vice Lords gang who were selling drugs in the neighborhood, including 20-year-old Deon Patrick, a leader in a faction of the gang known as the Conservative Vice Lords. Patrick was eventually charged

with two counts of murder and related crimes in connection with the killings. A jury found him guilty, and he served 21 years of a life sentence before the convictions were vacated.

This suit for damages followed. Patrick claimed he was framed by Chicago police. The defendants maintained that he is guilty even though the convictions were thrown out. Patrick won a substantial damages verdict, so the jurors obviously credited his version of the story. We sketch the facts adduced at trial in the light most favorable to the verdict.

Chicago Police Detectives Anthony Villardita and Thomas Johnson were assigned to lead the investigation into the Lassiter/Haugabrook murders. At the scene they interviewed Faye McCoy, Lassiter's neighbor. McCoy said she saw four men leave the apartment building immediately after the shots were fired. She gave the detectives the following information about the men: they were young (approximately age 24 or 25), black, and were recently seen selling drugs in the area and frequenting Lassiter's apartment, though they were not from the immediate neighborhood. She recognized one of the men as "Goldie," the nickname used by Dennis Mixon, the 31-year-old leader of the Vice Lords faction known as the Traveling Vice Lords. She also told the detectives that Lassiter had been beaten up the week before—badly enough to be taken to the hospital.

The investigation progressed slowly over the next two weeks. By the end of the November, Mixon remained the only suspect. In early December, however, officers arrested Patrick and six members of the Traveling Vice Lords: Lewis Gardner, age 15; Daniel Taylor, age 17; brothers Paul and

Akia Phillips, ages 17 and 19; Joe Brown, age 20; and Rodney
Matthews, age 22.

Between December 2 and 5, five detectives—Villardita,
Johnson, Terrence O'Connor, Ricardo Abreu, and Brian
Killacky—participated in the interrogation of the seven
suspects; some detectives had a larger role than others. The
interrogators used physical and psychological coercion and
extracted false confessions from each suspect. (Or so a jury
could reasonably believe.) The false confessions were inter-
locking in that each contained the same basic narrative that
the murders were committed in retaliation for Lassiter's
unpaid drug debt. Though differing in details, the confes-
sions generally described the following: the gang members
convened a meeting in Clarendon Park at about 7 p.m. on
the night of the murders; Mixon, Patrick, and the six other
suspects were there (along with others); they discussed
Lassiter's drug debt and the fact that he hadn't paid up
despite previous beatings; and a gun was displayed and the
murder plot was hatched. The interlocking confessions
placed Mixon, Patrick, Taylor, and Matthews inside the
apartment and described Gardner, Brown, and the Phillips
brothers as lookouts. Mixon and Patrick were identified as
the shooters, but the confessions differed on who shot which
victim.

The false confessions were the product of a combination
of psychological manipulation and physical deprivations—
and in some cases, physical abuse or threats of physical
abuse. Except for Gardner, all of the suspects were held in
locked, windowless interrogation rooms for long periods of
time (some for as long as 28–30 hours) without clocks, often
handcuffed to the wall, and some without bathroom breaks,

phone calls, or food or drink. A detailed description of the
interrogations is not necessary; the defendants do not chal-
lenge the sufficiency of the evidence to support the verdict,
so a few specifics will suffice. Akia Phillips testified that he
was beaten during his interrogation. Matthews was hand-
cuffed to the wall with no chair and urinated on himself
when no one responded to his shouts to be taken to the
bathroom. Taylor gave the detectives an alibi early in his
interrogation; he told them he was in lockup on a disorderly
conduct charge at the time of the murders, but they ignored
this claim, beat him, and promised he could go home if he
confessed, so he told them what they wanted to hear. More
generally, the detectives played the suspects off of one
another, telling them that the others had implicated them
and providing the details of the story they needed to agree
to in order to end their interrogations.

In between these interrogation sessions, Detectives
Villardita and Johnson put Patrick, Matthews, Brown, and
Paul Phillips in a lineup and brought McCoy in to view it.
She said she recognized all four and they were *not* the men
she saw leaving the apartment building after the murders.
Detectives Villardita and Johnson gave Detective Killacky a
false version of McCoy's statement to include in the lineup
report. His resulting report omitted her exculpatory state-
ment and instead falsely stated that she told the detectives
that she had seen the four men in the neighborhood and was
afraid and would not go to court.

A few details about Patrick's interrogation are worth
mentioning. He was arrested at about 11:30 p.m. on
December 2, and Detectives Villardita, O'Connor, and Abreu
interrogated him on and off for almost 30 hours. He was

given no food or drink and was not allowed to sleep. He was handcuffed to the wall, and the detectives periodically kicked the chair away from him so he could not sit. They ignored his requests to speak with his lawyer, whom he identified by name. They told him he would get the death penalty. They threatened to use force and led him to believe they were abusing Matthews, who was screaming in a nearby interrogation room. They told Patrick that his friends had given him up, and they brought Taylor into the room and made him implicate Patrick face-to-face. They falsely told Patrick that he had been identified in the lineup. There's more, but that's the gist of what the jury heard.

At the end of the interrogations, the detectives gave Patrick, Matthews, and Brown handwritten confessions to sign. The detectives rehearsed the confession details with the other suspects, who repeated them before a court reporter and an Assistant State's Attorney.

About 24 hours after the last of these confessions, Detectives Villardita and Johnson learned of information confirming Taylor's alibi that he was in lockup at the time of the murders. This was obviously a significant development because all of the interlocking confessions placed Taylor at the Clarendon Park planning meeting at 7 p.m. and inside Lassiter's apartment at 8:43 p.m. when the murders occurred. Early on December 6, Officer Steve Caluris called Detective Villardita and told him he had found an arrest report showing that a person named Daniel Taylor was arrested for disorderly conduct at 6:45 p.m. on the evening of the murders and bonded out of lockup at 10 p.m. A bond slip, signed by Officer James Gillespie and also by Taylor, likewise reflected that Taylor bonded out at 10 p.m.

Detectives Villardita and Johnson interviewed Officer Gillespie about the bond slip and created a report dated December 6–7 falsely attributing statements to him to make it appear that the alibi was phony. In particular the report falsely stated that Officer Gillespie told the detectives that Taylor may already have been released by the time he (Gillespie) signed the bond slip. As Officer Gillespie explained at trial, however, he would not have said that. He *always* signed bond slips *before* the detainees signed them and were released, not after. A handwriting expert testified at trial to a high degree of probability that the detainee signature on the bond slip was Taylor's.

In further effort to undermine Taylor's lockup alibi, on December 7 Detectives Villardita and Johnson arrested a drug addict named Adrian Grimes and induced him to testify before the grand jury that he had seen Taylor, Patrick, Gardner, Brown, and Paul Phillips in Clarendon Park on the evening of the murders, though he was imprecise about the time. Grimes later recanted and said he had lied in order to obtain favorable treatment on drug charges against him. Finally, about a month after the murders, Detectives Villardita and Johnson instructed Officers Sean Glinski and Michael Berti to prepare a report saying they had seen Taylor around Lassiter's apartment on the night of the murders. They did so; their report is dated December 14.

Mixon was arrested on March 1, 1993, and the eight suspects faced murder and related charges in Cook County Circuit Court based primarily on the interlocking confessions. The court suppressed two of the confessions— Brown's and Akia Phillips's—and dismissed the charges against them. Matthews was acquitted after a jury trial.

Gardner was convicted in a bench trial and sentenced to 30 years in prison. The others were convicted after jury trials. Paul Phillips received a sentence of 30 years. The others—Mixon, Patrick, and Taylor—were sentenced to life in prison and concurrent terms for the related robbery and home-invasion charges.

Patrick's convictions were affirmed on direct appeal, and his 1999 petition for postconviction relief also failed. In 2013 he filed a new petition to vacate his convictions. He attached affidavits supporting his innocence, including one from Mixon, who swore that Patrick was not involved in the murders and instead implicated a man named Lemuel Hardy. In 2014 the State's Attorney's Office filed its own motion to vacate Patrick's convictions. The court granted the motions, vacated the convictions, and ordered Patrick released. The court also vacated Taylor's, Gardner's, and Paul Phillips's convictions, and they too were released, also on motions by the State's Attorney.

Patrick then sought a certificate of innocence from the Cook County Circuit Court. His petition simply summarized the evidence supporting his innocence; he did not submit affidavits or other evidence. Under Illinois law only the Attorney General and the State's Attorney may be heard in opposition to a petition for a certificate of innocence; they took no position. Based on Patrick's summary presentation, the court granted the petition and issued a certificate of innocence.

Patrick then sued the seven detectives involved in the investigation and Martin Fogarty and Joseph Magats, two Assistant State's Attorneys who prosecuted the case against him. The complaint raised 13 claims under § 1983 and state

law and also named the City of Chicago as a defendant. The
district judge narrowed the case at summary judgment, and
the following claims proceeded to trial: (1) a claim for viola-
tion of Patrick's Fifth Amendment right against self-
incrimination stemming from the admission of his coerced
confession against him at trial; (2) a due-process claim based
on fabrication of evidence; (3) a claim for conspiracy to
violate Patrick's civil rights; (4) a claim for failure to inter-
vene to prevent the foregoing constitutional violations; (5) a
state-law claim for malicious prosecution; and (6) a state-law
conspiracy claim.

After a lengthy trial, the jury cleared the prosecutors and
Detective Killacky of wrongdoing but found the others liable
as follows:

- Detectives Villardita, O'Connor, and Abreu were
  found liable on the claim for violation of Patrick's
  Fifth Amendment right against compulsory self-
  incrimination;

- Detectives Villardita, Johnson, Berti, and Glinski
  were found liable on the due-process claim based
  on fabrication of evidence;

- Detectives Villardita, Johnson, O'Connor, Abreu,
  Berti, and Glinski were found liable on the federal
  claims for conspiracy to violate Patrick's civil
  rights and failure to intervene; and

- Detectives Villardita, Johnson, O'Connor, and
  Abreu were found liable on the state-law claims
  for malicious prosecution and conspiracy.

The jury awarded $13.3 million in compensatory damag-
es and punitive damages as follows:

- $20,000 each against Detectives Villardita and Johnson;

- $15,000 each against Detectives O'Connor and Abreu; and

- $10,000 each against Detectives Berti and Glinski.

The defendants moved for judgment as a matter of law or a new trial. The judge denied both forms of relief and entered judgment on the jury's verdict. The City had stipulated to liability if the jury found any of its officers liable, so the judgment is effective against the City. Its lawyers appeared for all defendants on this appeal.

## II. Discussion

The defendants raise three issues on appeal. They argue that the case should have been dismissed as a sanction for Patrick's perjury during discovery, which was uncovered at trial. They also challenge the judge's decision to admit the certificate of innocence into evidence at trial. Lastly, they raise a claim of error in the jury instructions.

## A. Dismissal as a Sanction for Perjury in Discovery

The defendants argue that the sanction of dismissal was warranted based on two falsehoods in Patrick's deposition testimony. The perjury was exposed at the trial, so the defendants' posttrial motion asked the court to dismiss the case as a sanction under either Rule 37 of the Federal Rules of Civil Procedure or the court's inherent power.

A district judge has broad discretion to sanction a party or his counsel for litigation misconduct. *Fuery v. City of Chicago*, 900 F.3d 450, 452 (7th Cir. 2018) (inherent authority); *James v. Hyatt Regency Chi.*, 707 F.3d 775, 784 (7th Cir. 2013)

(Rule 37). We review a decision to impose or withhold sanctions for abuse of discretion, reversing only when the ruling is one no reasonable judge would have made. *Fuery*, 900 F.3d at 452.

Patrick told two lies in his pretrial deposition. First, he testified that he had never lied in an affidavit. That was untrue. In the affidavit he submitted in support of his 1999 petition for postconviction relief, Patrick falsely claimed that he had witnessed Taylor's arrest for disorderly conduct on the evening of the murders. Patrick admitted at another point in his deposition that he had not in fact witnessed Taylor's arrest, contradicting his broader claim that he had never lied in an affidavit, and this discrepancy in his deposition testimony was thoroughly explored at trial. Second, Patrick testified in his deposition that he had never spoken to Lemuel Hardy, whom Mixon had implicated in the murders in Patrick's second postconviction motion. At trial, however, Patrick admitted that this part of his deposition testimony was also untrue, acknowledging that he had, in fact, spoken to Hardy in prison.

The judge found this misconduct deeply unsettling but declined to dismiss the case as a sanction. The judge reasoned that Patrick's lies did not concern core issues in the litigation and were fully exposed at trial as part of a rigorous attack on his credibility during cross-examination. (His criminal history and gang affiliation were emphasized as well.) The judge noted that whether Hardy was actually involved in the murders was not pivotal to Patrick's civil-rights case. Finally, the judge observed that Patrick's claim in his deposition that he told the truth in all past affidavits was so transparently false as to be harmless because he directly

contradicted his 1999 affidavit at another point in that very same deposition. Weighing all these factors, the judge determined that the sanction of dismissal was unwarranted.

That was a reasonable judgment call. The defendants insist that the judge placed too much weight on the lack of prejudice, noting that a showing of prejudice is not a prerequisite to the imposition of sanctions for litigation misconduct. It's true that sanctions may be imposed even if the opposing party suffered no prejudice, but a judge may properly consider the effect of the misconduct on the course of the litigation when deciding whether sanctions are justified. *Id.* at 464. Patrick's dishonesty under oath was a serious matter, but his falsehoods concerned relatively peripheral matters and were fully explored in cross-examination as part of a vigorous impeachment of his trial testimony. The jury weighed the totality of Patrick's testimony against the other evidence in the case and made its decision accordingly. The judge did not abuse his discretion in declining to dismiss the case as a sanction for Patrick's two deposition falsehoods.

## B. Certification of Innocence

Next up is a challenge to the judge's decision to admit Patrick's certificate of innocence at trial. The defendants filed a motion in limine seeking to exclude the certificate of innocence under Rule 403 of the Federal Rules of Evidence. The judge denied the motion, and we review that ruling under the deferential abuse-of-discretion standard. *Doornbos v. City of Chicago*, 868 F.3d 572, 579 (7th Cir. 2017). The defendants raised this issue again in their posttrial motion for a new trial. That motion also failed, and we review the judge's decision for abuse of discretion. *Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408, 414 (7th Cir. 2015). Finally,

an evidentiary error warrants a new trial only if the error had a substantial and injurious effect on the jury's decision and the result is inconsistent with substantial justice. *Doornbos*, 868 F.3d at 579.

Under the familiar Rule 403 formula, "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of … unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." FED. R. EVID. 403. The defendants argued below and reiterate here that a certificate of innocence has only limited probative value in a civil-rights case for wrongful conviction and its relevance is far outweighed by the risk of unfair prejudice or confusion of the issues.

The judge admitted the certificate of innocence largely because he concluded that it was highly relevant to Patrick's case—in particular, to his malicious-prosecution claim. Under Illinois law a plaintiff in a suit for malicious prosecution must prove not only that his conviction was vacated but that the prosecution was favorably terminated in a manner indicative of innocence. *Swick v. Liautaud*, 662 N.E.2d 1238, 1243 (Ill. 1996). A certificate of innocence entails a finding by a state-court judge that a criminal defendant has shown by a preponderance of the evidence that he "is innocent of the offenses charged in the indictment or information." 735 ILL. COMP. STAT. 5/2-702(g)(3). The district judge held—and we agree—that Patrick's certificate of innocence was directly relevant to an element on which he bore the burden of proof: that the prosecution against him was terminated in a manner indicative of innocence.

On the other side of the Rule 403 scale, a certificate of innocence carries a risk of unfair prejudice if misunderstood. The principal purpose of a certificate of innocence is to remove legal obstacles that prevent a wrongly convicted person from receiving relief in the Illinois Court of Claims. *Id.* § 5/2-702(a). Accordingly, the certificate-of-innocence statute expressly provides that "[t]he decision to grant or deny a certificate of innocence shall be binding only with respect to claims filed in the Court of Claims and shall not have a res judicata effect on any other proceedings." *Id.* § 5/2-702(j). Of course, removing res judicata effect does not mean that a certificate of innocence is categorically inadmissible in other proceedings. Still, the admissibility calculus should be weighed with care.

Moreover, there were important limits to the probative value of Patrick's certificate of innocence. His petition simply summarized the evidence of his innocence; no affidavits or other evidence was adduced, and no hearing was held. The petition process permits only the Illinois Attorney General and the State's Attorney for Cook County to participate in opposition to a certificate of innocence, *see id.* § 5/2-702(e), and they took no position on Patrick's petition. His certificate of innocence thus does not really reflect a factual finding arising from the crucible of the adversarial process, which our legal system regards as the best means of discovering the truth. The defendants were understandably concerned that jurors may be tempted to give conclusive weight to the certificate of innocence merely because it reflects a formal judicial finding.

There is also a possibility that introducing a certificate of innocence as evidence in a civil-rights suit may risk confus-

ing the issues. The jury in a case like this need not decide the plaintiff's innocence but instead is asked to determine whether one or more of the defendants violated his federal constitutional or state-law rights in the manner alleged. The focus of a certificate-of-innocence petition is different; the state-court judge considers the materials attached to the petition in relation to the evidence presented against the petitioner at his criminal trial. *People v. Fields*, 959 N.E.2d 1162, 1166 (Ill. App. Ct. 2011).

Well-crafted jury instructions can guard against the risk of unfair prejudice or confusion of the issues. Here the judge properly instructed the jury that it need not decide whether Patrick committed the crimes charged against him in the criminal case. The instruction went on to explain that Patrick's actual guilt or innocence was one of many factors the jury was free to consider in determining whether the defendants violated his rights. A more specific cautionary instruction regarding the limits of a certificate of innocence would have been better. *See, e.g.*, *Harris v. City of Chicago*, 2018 WL 2183992, at *4–6 (N.D. Ill. May 11, 2018) (St. Eve, J.). But the defendants did not propose one, so we cannot fault the judge for not fashioning something more precise.

The defendants also argue that certain improper statements by Patrick's counsel in closing argument amplified the prejudicial effect of the certificate of innocence, necessitating a new trial. This is framed as a claim of cumulative error, which considers whether the combined effect of multiple trial errors was so severe that the trial was fundamentally unfair. *Thompson v. City of Chicago*, 722 F.3d 963, 979 (7th Cir. 2013). Here is the passage the defendants claim was improper:

> Now, Mr. Scahill [the defendants' attorney] told you on the first day that Deon Patrick's certificate of innocence is not worth the paper it was written on, and he told you that again today. If you believe Deon Patrick, if you believe that Daniel Taylor was in lockup, if you believe that these defendants violated his civil rights, I hope you are offended by that concept. I hope you are outraged and incensed, and I hope that you show that you are by your compensatory verdict for Deon Patrick. And that you show them what the value is of a piece of paper that says you're actually innocent and what the value of somebody's life can be and what the value is, ladies and gentlemen, of 21 years, 1 month, 8 days. Thank you.

The defendants' attorney preserved an objection to this "send a message" argument at sidebar. The defendants now argue that this passage was an improper appeal to the jury's sense of outrage—and these improper statements, in turn, risked inflaming the prejudice caused by the admission of the certificate of innocence.

A jury has a duty to decide the case based on the facts and the law; a statement by counsel urging it to decide instead based on emotion is error. *United States v. Morgan*, 113 F.3d 85, 90 (7th Cir. 1997). On the other hand, improper comments in closing argument rarely constitute reversible error. *Moylan v. Meadow Club, Inc.*, 979 F.2d 1246, 1250–51 (7th Cir. 1992). As is customary, the judge instructed the jury to decide the case fairly and impartially based on the evidence and the law as contained in the judge's instruction

and without the influence of sympathy, prejudice, fear, or public opinion. We see no reason to believe that this instruction was insufficient to cure any prejudice from this brief passage of closing argument following a lengthy trial.

In sum, the certificate of innocence was directly probative on an element of Patrick's malicious-prosecution claim, and the judge appropriately instructed the jury to limit the risk of unfair prejudice or jury confusion. Although a more specific limiting instruction would have done more to guard against that risk, it was not error to admit the certificate of innocence with the more general instruction that the judge gave here. Nor was this isolated passage from closing argument so egregiously improper in combination with the certificate of innocence as to necessitate a new trial.

## C. Instructional Error

The final argument concerns an error in the jury instructions. We review claims of instructional error de novo, and a new trial is warranted only if an error in the instructions caused prejudice. *Glickenhaus & Co.*, 787 F.3d at 414.

As we've noted, the judge submitted four federal claims to the jury: (1) a claim for violation of Patrick's Fifth Amendment right against compulsory self-incrimination arising from the use of his coerced confession at trial; (2) a claim for violation of Patrick's right to due process arising from the fabrication of evidence; (3) a claim for conspiracy to violate Patrick's civil rights; and (4) a claim for failure to intervene to prevent these civil-rights violations. At issue here is the jury instruction for the due-process "evidence fabrication" claim.

We have recently clarified the contours of constitutional claims based on allegations of evidence fabrication. A claim for false arrest or pretrial detention based on fabricated evidence sounds in the Fourth Amendment right to be free from seizure without probable cause. *Lewis v. City of Chicago*, 914 F.3d 472, 476–78 (7th Cir. 2019). If fabricated evidence is later used at trial to obtain a conviction, the accused may have suffered a violation of his due-process right to a fair trial. *Id.* at 479. And "misconduct of this type that results in a conviction might also violate the accused's right to due process under the rubric of *Brady* … and *Kyles* … if government officials suppressed evidence of the fabrication." *Id.* at 480; *see also Avery v. City of Milwaukee*, 847 F.3d 433, 439–43 (7th Cir. 2017).

The essence of a due-process evidence-fabrication claim is that the accused was convicted and imprisoned based on knowingly falsified evidence, violating his right to a fair trial and thus depriving him of liberty without due process. A conviction premised on fabricated evidence will be set aside if the evidence was material—that is, if there is a reasonable likelihood the evidence affected the judgment of the jury. *United States v. Agurs*, 427 U.S. 97, 103 (1976). The materiality standard for a *Brady* evidence-suppression claim is stated somewhat differently, referring to a "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985). Either way, if the fabricated evidence was immaterial, it cannot be said to have caused an unconstitutional conviction and deprivation of liberty.

Patrick's evidence-fabrication claim was grounded in an alleged violation of due process.[1] Accordingly, the defendants proposed a jury instruction that would have placed the burden on Patrick to prove that the defendant (each one considered individually) fabricated evidence against him; the evidence was used at his criminal trial; the evidence was material; and he was damaged as a result. This proposed instruction tracked an updated pattern instruction that had been proposed and published for comment by the Seventh Circuit Committee on Pattern Civil Jury Instructions but had not yet been finally approved for publication by the Seventh Circuit Judicial Council.

The judge rejected the defendants' proposal. Instead, he instructed the jury as follows:

> Plaintiff clams that all the Defendants violated his right to due process under the Fifth and Fourteenth Amendments to the United States Constitution by fabricating evidence against him. To succeed on this claim against any of the Defendants, Plaintiff must prove each of the following propositions by a preponderance of the evidence:
>
> 1. The Defendant you are considering knowingly fabricated false evidence or participated in fabricating false evidence;

---

[1] But it was not a *Brady* claim. Patrick's original complaint alleged *Brady* violations, but the judge entered summary judgment for the defendants and that ruling is not contested here.

2.  That evidence was used to deprive Plain-
    tiff of his liberty in some way; [and]

3.  The fabricated evidence proximately
    caused Plaintiff to be damaged.

This instruction was incomplete in that it failed to ex-
plain that Patrick had the burden to prove that the fabricated
evidence was used against him at his criminal trial and was
material. The instruction proposed by the defendants in-
cluded these elements, as reflected in the modified pattern
jury instruction, which has since been approved for publica-
tion. FEDERAL CIVIL JURY INSTRUCTIONS OF THE SEVENTH
CIRCUIT § 7.14 (2017). We therefore agree with the defend-
ants that it was error to reject their proposed instruction.

We're satisfied, however, that the error was harmless.
There's no dispute that Patrick's coerced confession and the
falsified lineup report were used at his criminal trial to
convict him, and no one argues that this fabricated evidence
was immaterial. Four defendants were found liable on the
due-process claim: Detectives Villardita and Johnson, and
Officers Berti and Glinski. Detective Villardita was unques-
tionably involved in Patrick's interrogation. Both detectives
were involved in falsifying the lineup report. Officers Berti
and Glinski were not, but all four officers were found liable
on two additional federal claims—conspiracy to violate
Patrick's civil rights and failure to intervene. And the jury
additionally found Detectives Villardita and Johnson liable
for malicious prosecution and conspiracy under state law.
Finally, Detective Villardita was found liable for violating
Patrick's Fifth Amendment right against compulsory self-
incrimination based on the admission of his coerced confes-
sion against him at trial.

The defendants have not challenged these liability findings, any of which is independently adequate to support the jury's damages award for the more than two decades Patrick wrongly spent in prison. We note again that the City stipulated to liability if any of its officers were found responsible for violating Patrick's rights. There can be only one compensatory recovery regardless of the number of counts on which the defendants were found liable.

The defendants maintain that the jury might have altered its assessment of punitive damages if it had been properly instructed on the due-process claim. That is doubtful. The punitive awards were quite small—$10,000 each against Officers Berti and Glinski and $20,000 each against Detectives Villardita and Johnson—and were not likely to have been materially influenced by the number of counts on which the four defendants were found liable. To the contrary, the jury was instructed, in accordance with the pattern jury instruction, to consider the following factors in assessing punitive damages: the reprehensibility of the defendant's conduct, the impact of that conduct on the plaintiff, the relationship between the plaintiff and the defendant, the likelihood the defendant would repeat the conduct if an award is not made, and the relationship of the award to the amount of harm the plaintiff suffered. *Id.* § 7.28. In short, the jury was instructed to consider the nature of each defendant's *conduct*, not the number of legal violations each defendant committed.

Accordingly, although the instruction on the due-process claim erroneously omitted elements of Patrick's burden of proof, we find the error harmless under the circumstances of this case.

### III. Conclusion

In sum, the judge reasonably declined to dismiss the case as a sanction for Patrick's two falsehoods in his deposition. It was not error to admit the certificate of innocence at trial, though the better practice would have been to contextualize it with a more specific cautionary instruction. Finally, although the jury instruction on the due-process claim was incomplete, the error does not require reversal.

AFFIRMED